[Cite as *Berry v. Lupica*, 196 Ohio App.3d 687, 2011-Ohio-5381.]

<span style="color:red">**[Please see vacated opinion at 2011-Ohio-3462.]**</span>

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

### JOURNAL ENTRY AND OPINION
### No. 95393

## BERRY,

APPELLANT,

v.

## LUPICA ET AL.,

APPELLEES.

## JUDGMENT:
## AFFIRMED, AS MODIFIED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-613669

**BEFORE:**  Stewart, J., Blackmon, P.J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:**  October 18, 2011

**ATTORNEYS:**

Morganstern, MacAdams & DeVito Co., L.P.A., Christopher M. DeVito, and Alexander J. Kipp, for appellant.

Moscarino & Treu, L.L.P., Kris H. Treu, William H. Falin, and Michael J. Kahlenberg, for appellees.

ON RECONSIDERATION.[1]

MELODY J. STEWART, Judge.

{¶ 1} Plaintiff-appellant, Robert Berry, brought suit against his supervisor, defendant-appellee James Lupica, and their employer, defendant-appellee Wachovia Securities, alleging that Wachovia had breached an agreement to pay the full amount of an arbitration award between Berry and his former employer, Merrill Lynch. Wachovia counterclaimed, alleging that Berry had breached an agreement that he would compensate Wachovia for certain amounts that it advanced to Merrill Lynch in partial satisfaction of Berry's obligation under the arbitration award. A jury ruled against Berry on all of his claims and ruled in favor of Wachovia on its counterclaim. Berry unsuccessfully filed postjudgment motions seeking a remittitur, a new trial, and judgment notwithstanding the verdict. In this appeal, he offers overlapping arguments that he was neither legally nor factually obligated to repay the amounts that Wachovia advanced to Merrill Lynch and that the jury's award of damages beyond that specifically requested by Wachovia constituted grounds for a new trial.

I

{¶ 2} Berry worked for Merrill Lynch as a financial advisor before being hired by Wachovia (he was actually hired by First Union Corporation, which was taken over by Wachovia, which in turn was taken over by Wells Fargo, but the parties have agreed to use the name "Wachovia" in this litigation, so we use it too). The terms of Berry's employment agreement with Merrill Lynch contained a noncompetition agreement. When Berry started working for

---

[1]The original announcement of decision, *Berry v. Lupica*, 8th Dist. No. 95393, 2011-Ohio-3462, released and journalized July 14, 2011, is hereby vacated. This opinion, issued upon reconsideration, is the court's journalized decision in this appeal. See App.R. 22(C); see also S.Ct.Prac.R. 2.2(A)(1).

Wachovia, Merrill Lynch claimed that he did so in violation of the noncompetition agreement; Berry claimed that Merrill Lynch made defamatory statements about him regarding the violation of the noncompetition agreement. Berry and Merrill Lynch took their dispute to binding arbitration before the National Association of Securities Dealers ("NASD"). An NASD panel ruled in favor of Merrill Lynch on its claims against Berry and awarded it $250,000. The NASD panel also found for Berry on his defamation claim against Merrill Lynch and awarded him $125,000 in damages.

{¶ 3} Wachovia paid Merrill Lynch the $250,000 judgment against Berry. Two days later, Merrill Lynch issued a check to Berry for $125,000. Berry endorsed the Merrill Lynch check and gave it to his Wachovia branch manager with a note saying:

{¶ 4} "As we discussed attached is the award I received from Merrill Lynch. Please place this check on deposit with First Union Corporation to offset the interest due on our contract. The $125,000 is to be returned on demand. Thank you for your consideration and cooperation."

{¶ 5} The branch manager forwarded the check to the Wachovia legal department, and the check was deposited into a Wachovia account dedicated to legal settlements. Berry later demanded to have the check returned to him, but Wachovia refused to return it.

{¶ 6} Berry brought this action raising a number of claims that collectively accused Wachovia of breaching the agreement to hold Berry's Merrill Lynch proceeds and produce them on demand. Wachovia counterclaimed, arguing that Berry breached a settlement agreement under which he would set off the $250,000 Wachovia paid to Merrill Lynch by delivering to Wachovia the $125,000 he received from Merrill Lynch—Wachovia would pay the remaining $125,000 of the arbitration award as a courtesy to Berry. It claimed as damages the attorney fees it had expended or would be required to expend in enforcing the settlement.

**{¶ 7}** At trial, the issue was whether the parties had an agreement that the proceeds from the $125,000 Merrill Lynch award to Berry should be applied as a setoff for the $250,000 that Wachovia paid to Merrill Lynch. Berry claimed that at the time he was hired, Wachovia represented to him not only that it would pay for any legal fees associated with the Merrill Lynch arbitration, but also that it would pay any damage award. Berry also offered testimony that the financial-industry standard was for a current employer to make a transferring broker like Berry whole from any claims asserted by a former employer. Wachovia conceded that it agreed to pay for Berry's legal defense in the arbitration, but denied that it agreed, prior to the arbitration, to pay any damage award from the arbitration. It presented witnesses who testified that Wachovia and Berry agreed after the arbitration that Wachovia would pay the entire $250,000 Merrill Lynch judgment on the condition that Berry pay over to Wachovia his $125,000. Wachovia thus said it agreed to pay a net total of $125,000, an amount that it had been willing to pay to settle the arbitration.

**{¶ 8}** The jury found against Berry on all his claims. The jury found in favor of Wachovia on its counterclaim and awarded $432,000 in damages for the attorney fees Wachovia had expended in enforcing the settlement agreement. Berry filed a motion for judgment notwithstanding the verdict and a new trial, arguing that the verdict was against the manifest weight of the evidence because the $432,000 damage award exceeded the $130,000 that Wachovia claimed as damages. The excessive award, Berry argued, showed that the jury's verdict had been the product of passion or prejudice. Berry also asked the court for remittitur. All postjudgment motions were denied.

II

{¶ 9} Berry argues that the court erred both by failing to direct a verdict and to grant judgment notwithstanding the verdict on Wachovia's counterclaim because it was barred by the statutes of fraud and limitations.

A

{¶ 10} The court must issue a directed verdict when, "after construing the evidence most strongly in favor of the party against whom the motion is directed, [the court] finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party." Civ.R. 50(A)(4). This is the same legal standard applied to motions for judgment notwithstanding the verdict, *Ayers v. Woodard* (1957), 166 Ohio St. 138, 140 N.E.2d 401, and tests the legal sufficiency of the evidence. This is a question of law that does not require the reviewing court to weigh the evidence or test the credibility of witnesses. See *Ruta v. Breckenridge-Remy Co.* (1982), 69 Ohio St.2d 66, 430 N.E.2d 935.

B

{¶ 11} The statute of frauds is set forth in R.C. 1335.05 and states: "No action shall be brought whereby to charge the defendant, upon a special promise, to answer for the debt, default, or miscarriage of another person; * * * unless the agreement upon which such action is brought, or some memorandum or note thereof, is in writing and signed by the party to be charged therewith or some other person thereunto by him or her lawfully authorized."

{¶ 12} As Wachovia notes, its counterclaim was not brought in order to force Berry to pay a debt that he owed to another person—it brought the counterclaim seeking compensation for Berry's breach of the settlement agreement. "When the leading objection of the promisor is not to answer for another's debt but to subserve some pecuniary or business purpose of his own involving

a benefit to himself, his promise is not within the statute of frauds * * *." See *Wilson Floors Co. v. Sciota Park, Ltd.* (1978), 54 Ohio St.2d 451, 377 N.E.2d 514, syllabus. The statute of frauds is therefore inapplicable, and the court did not err as a matter of law by refusing to direct a verdict or grant judgment notwithstanding the verdict on that basis.

C

{¶ 13} Berry next argues that the court should have directed a verdict on statute-of-limitations grounds. He maintains that the parties did not reduce their settlement agreement to writing, so the six-year statute of limitations for oral contracts began to run in April 2002, when he appealed from the arbitration award and otherwise sought to vacate the award.

{¶ 14} R.C. 2305.07 provides a six-year statute of limitations for contracts not reduced to writing. The statute of limitations for oral contracts begins when the cause accrues. Id. When an oral agreement does not specify a time for repayment of a debt, the cause does not accrue until a party demands payment. See *Aluminum Line Prods. Co. v. Brad Smith Roofing Co., Inc*. (1996), 109 Ohio App.3d 246, 258, 671 N.E.2d 1343; *Dandrew v. Silver*, 8th Dist. No. 86089, 2005-Ohio-6355, ¶ 14.

{¶ 15} It is unclear why Berry concludes that his breach occurred in April 2002 upon his appeal of the arbitration award. He gave Wachovia the $125,000 check he received from Merrill Lynch as part of his arbitration award. Even though Berry contests whether he intended the check to be used in settlement for Wachovia paying the $250,000 award against him, it was only when Berry filed this action in January 2007, seeking the return of the $125,000, that he could be said to have breached the settlement agreement. Wachovia filed its counterclaim in January 2009, just two years after Berry filed his complaint—well within the six-year statute of limitations. The court did not err by refusing to direct a verdict on statute-of-limitations grounds.

D

{¶ 16} Finally, Berry complains that the court should have granted judgment notwithstanding the verdict on the ground that the alleged settlement agreement between him and Wachovia was not truly a settlement agreement because the parties were not adversaries in the NASD arbitration.

{¶ 17} It is true that the parties were not adversaries in the NASD arbitration (Merrill Lynch and Berry were the adversaries), but that fact has no bearing on whether Berry and Wachovia reached an agreement on how they would handle the payment of Merrill Lynch's arbitration award. The right of parties to form contracts is general unless specifically prohibited by law or prevented by reason of fixed public policy. *Pittsburgh, Cincinnati, Chicago & St. Louis Ry. Co. v. Kinney* (1916), 95 Ohio St. 64, 115 N.E. 505, paragraph one of the syllabus. To the extent that the parties differed on the question of who would pay the Merrill Lynch award, their agreement was, in a broad sense, a "settlement" of that question. In any event, the nomenclature used to define the contractual parameters agreed to by the parties is far less important than the obligations imposed. Regardless of whether Wachovia correctly labeled the contract as a "settlement," the fact remains that the jury did, in fact, find that there was a valid contract between the parties.

III

{¶ 18} Berry next raises issues relating to the award of attorney fees as damages for the breach of the settlement. He maintains that under the American rule of attorney fees, which states that the prevailing party in a legal action may not, in the absence of statutory authority, recover attorney fees, the court could not allow Wachovia to recover its legal fees as compensatory damages.

{¶ 19} As Berry notes, Ohio adheres to the rule that "a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 2009-Ohio-306, 906 N.E.2d 396, at ¶ 7. However, attorney fees are allowed as compensatory damages when the fees are incurred as a direct result of the breach of a settlement agreement. See *Raymond J. Schaefer, Inc. v. Pytlik*, 6th Dist. No. OT-09-026, 2010-Ohio-4714, ¶ 34; *Tejada-Hercules v. State Auto. Ins. Co.*, 10th Dist. No. 08AP-150, 2008-Ohio-5066, ¶ 10. The rationale behind the exception for allowing attorney fees expended as a result of enforcing a settlement agreement is that "any fees incurred after the breach of the settlement agreement were relevant to the determination of compensatory damages, including those fees [a party was] 'forced' to incur by filing the action." *Tejada-Hercules* at ¶ 10.

{¶ 20} The legal fees awarded in this case were the measure of compensatory damages directly related to Wachovia's need to enforce the settlement agreement. The court did not err by awarding Wachovia its attorney fees as compensatory damages.

IV

{¶ 21} Berry's primary argument, raised in various assignments of error, is that the jury's finding that a contract existed between him and Wachovia relating to the payment of Merrill Lynch is against the manifest weight of evidence.

{¶ 22} It is a basic principle of appellate review that judgments supported by competent, credible evidence going to all the material elements of a case must not be reversed as against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus; *Gerijo, Inc. v. Fairfield* (1994)*, 70 Ohio St.3d 223, 226, 638 N.E.2d 533. We therefore indulge every reasonable presumption in favor of the trial court's judgment, *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273, and to the extent

that the evidence is susceptible of more than one interpretation, we construe it consistently with the jury's verdict. *Ross v. Ross* (1980), 64 Ohio St.2d 203, 414 N.E.2d 426.

{¶ 23} Berry premised his complaint on two grounds: (1) the Wachovia branch manager who recruited Berry told him that Wachovia "would take care of everything" in the event Merrill Lynch brought suit, including the payment of legal fees and any damages award, and (2) Wachovia's promise was consistent with a financial-industry practice under which firms that recruited brokers away from other firms would provide the recruited broker a legal defense in an arbitration and pay any damage award resulting from the arbitration.

{¶ 24} The evidence was in conflict whether Wachovia would indemnify Berry in the event that he received an adverse arbitration ruling. Wachovia's branch manager recalled that at the time he recruited Berry, he offered to pay Berry's legal expenses but had no recollection that he had agreed to pay for any damages. And the attorney who represented Wachovia in the arbitration said that when preparing the Berrys for their testimony in the arbitration, they told him that Wachovia "had not agreed to pay them for any awards." On the other hand, Berry's wife (who herself was recruited by Wachovia from Merrill Lynch and was a party to the arbitration) testified at the arbitration hearing that Wachovia had not used the word "indemnify" with her, but she also said that even though she had no discussion with Wachovia about indemnification, she understood from industry practice that Wachovia would pay any arbitration awards.

{¶ 25} Berry points to testimony from both parties that firms in the financial-services industry that recruited a broker from another firm would typically pay both legal fees and damages associated with any claims based on that recruitment. With that practice in mind, he takes Wachovia's silence on the issue of indemnity as proof that it intended to adhere to the industry practice of reimbursing any damages awarded against him. In other words, he argues that

Wachovia could only vary from the industry practice by specifically telling him, at the recruitment stage, that it would not reimburse him in the event Merrill Lynch decided to enforce the terms of his employment contract.

{¶ 26} What is merely "typical" or "practice" in a heavily regulated field like the financial-services industry is not necessarily binding in the absence of a specific rule or regulation. To be binding, an industry custom must be so well known, uniform, long established, and generally acquiesced in as to induce a belief that the parties contracted with reference to it, nothing appearing in their contract to the contrary. See, e.g., *Fid. Mtge. v. Bruno Airport Industry* (Dec. 10, 1981), 2d Dist. No. 1544, citing Restatement of the Law 2d, Contracts (1981), Section 221.

{¶ 27} Although Wachovia's in-house attorney acknowledged the "normal" practice whereby an investment firm would make a recruit whole for any arbitration award stemming from that recruitment, he testified that Wachovia would not make any promises to indemnify recruited brokers during the recruitment stage. Such a promise, said in-house counsel, could expose Wachovia to potential liability for interfering with business relations. The attorney who represented Wachovia at the arbitration agreed, noting that in preparation for the arbitration, he specifically asked the Berrys whether Wachovia agreed to indemnify them in order to prepare for a possible line of questioning from Merrill Lynch. He said he did so because a promise of indemnity by Wachovia could have raised the specter of interference with a contract resulting from Wachovia's recruitment of the Berrys. So even though Wachovia might "normally" make a broker whole for any arbitration award resulting from the recruitment process, it was not in any sense a "practice" from which the parties could be understood to have agreed to during the recruitment stage, and it was not clearly understood at the time of Berry's recruitment that Wachovia intended to reimburse him.

{¶ 28} Berry cites evidence showing that two other employees recruited by Wachovia were promised that Wachovia would reimburse them for any arbitration award entered against them stemming from their recruitment. This evidence actually supports the jury's verdict because it shows that if Wachovia had the intention to reimburse Berry, it would have told him that from the outset. That Wachovia did reimburse some brokers it recruited, but not Berry, suggests that Wachovia did not adhere to any industry practice—not that it deliberately ignored the practice only in this case. Wachovia's in-house counsel testified that most cases involving the recruitment of brokers ended with a settlement prior to arbitration and that Wachovia would pay the settlement. But paying to settle arbitration before the fact is not the same as paying an after-the-fact arbitration award when the broker is found personally liable for the award. Wachovia's payment of an arbitration claim for other employees does not establish a binding practice that could be applied to Berry's case.

{¶ 29} Other evidence supports the conclusion that Wachovia had no understanding that it would reimburse Berry for the entire Merrill Lynch arbitration award. At the close of the arbitration, the Wachovia branch manager spoke with the attorney who represented Wachovia at the arbitration, saying that Berry had made a demand for indemnification. He asked for instructions on what obligations, if any, Wachovia might have in relation to paying the award. That attorney e-mailed Wachovia's in-house counsel, stating his opinion that Wachovia had no obligation to indemnify Berry. The attorney recounted his recollection of settlement negotiations that occurred prior to the arbitration, noting that Wachovia had agreed in principle with Merrill Lynch to settle the matter on terms that would net Berry $130,000. There was credible evidence that Berry's attorney rejected the offer, instead demanding "millions." The attorney said that Berry's rejection of the settlement offer left Wachovia as a "hostage" to Berry's decision because

Merrill Lynch would not settle with Wachovia alone. This meant that Wachovia would be forced to pay the costs of arbitration solely because Berry wished to "roll the dice" in the hope of being awarded more damages.

{¶ 30} The jury also heard evidence from which it could conclude that Berry agreed to turn over the $125,000 he received from Merrill Lynch in consideration of Wachovia's $250,000 payment to Merrill Lynch. A few weeks after the arbitration award, the branch manager sent in-house counsel an e-mail stating that Berry was "very appreciative of our settlement to [sic] $125,000." A later e-mail from the arbitration attorney recounted how he had spoken with Berry's arbitration attorney over the logistics of handling the various awards, stating that Berry's attorney had the "understanding that [Wachovia] has agreed to pay half the award against the brokers." When Berry turned over his Merrill Lynch check to Wachovia, the branch manager noted, "[T]this is the $125,000 check for the Spencer/Berry settlement."

{¶ 31} Evidence concerning a settlement and representations from Berry's own attorney that Wachovia had agreed to pay half the award were credible evidence that the parties had reached an agreement over how the Merrill Lynch arbitration award would be paid between them. This was consistent with Wachovia's act of placing the money in an account reserved for legal settlements. Berry's own actions enforce the conclusion that a settlement existed because he turned the $125,000 check over to Wachovia in 2002 and did not demand its return until 2005. Although Berry argued that he left the check in Wachovia's custody to cover potential interest, the jury could validly reject that argument because there was no evidence of any interest being due. Moreover, during the three years that Wachovia held the money, Berry never asked for any interest statements or otherwise inquired as to the debt that he claimed was accruing.

{¶ 32} The jury could find the totality of the evidence credibly established that Wachovia understood that it would pay the $250,000 Merrill Lynch award as a courtesy to Berry, but that Berry would remit the $125,000 he received from Merrill Lynch. The jury could also find that the parties did not have an agreement to adhere to any industry practice of reimbursement. It follows that the jury's verdict was not against the manifest weight of the evidence and that the court did not err by refusing to grant judgment notwithstanding the verdict or a new trial on the same grounds.

V

{¶ 33} The jury awarded Wachovia attorney fees totaling $432,000. Berry complains that Wachovia only presented evidence that it had expended $133,691 in attorney fees. Berry argues that he is entitled to a new trial because the damage award showed that the jury's verdict was the product of passion and prejudice, a conclusion that he reinforces by noting that the jury had asked the court whether it could also award punitive damages against him.

A

{¶ 34} In its closing argument, Wachovia asked the jury to "return an award * * * for $133,691 which is the amount of the fees and expenses we've incurred in defending the case." This amount was supported by billing statements and Berry does not question either the hourly rate charged by Wachovia's attorneys or the number of hours worked.

{¶ 35} During its deliberations, the jury asked the court: "[A]re we able to award more to the defense above the requested legal fees?" and "[C]an the defense get punitive damages?" When considering the questions, the court noted that there had been no claim for punitive damages. It also told the parties that "[Wachovia] certainly can't get more than the requested legal fees, so that's the answer to that." The jury awarded $432,000.

**{¶ 36}** In response to Berry's motion for judgment notwithstanding the verdict on the issue of attorney fees, Wachovia argued that the $133,691 it asked for at trial reflected only the fees and costs up to the second day of trial and that the jury knew that "additional fees and expenses would be incurred" based on testimony that there had been "time that hasn't been billed yet." It claimed that by the close of trial, its attorney fees were $163,758. Including posttrial motion practice, the total amount rose to $171,268.

**{¶ 37}** In a contract case, the general measure of damages is the amount necessary to place the nonbreaching party in the position it would have been in had the breaching party fully performed under the contract. *Allied Erecting & Dismantling Co., Inc. v. Youngstown*, 151 Ohio App.3d 16, 2002-Ohio-5179, 783 N.E.2d 523, ¶ 62. Wachovia proved legal fees related to the enforcement of the settlement agreement in the amount of $133,691. Although it claimed that it incurred additional legal fees, it did not prove that assertion. "As a general rule, an injured party cannot recover damages for breach of contract beyond the amount that is established by the evidence with reasonable certainty * * *." *Rhodes v. Rhodes Industries, Inc*. (1991), 71 Ohio App.3d 797, 808-809, 595 N.E.2d 441. At a minimum, a party seeking legal fees must adhere to Prof.Cond.R. 1.5(a) and offer evidence showing the fee charged, the reasonableness of that fee, and the number of hours worked. Testimony by a Wachovia witness that there had "been time that hasn't been billed yet" is insufficient to establish any additional amount of legal fees, because that testimony did not establish the hours expended or the necessity of that work. It follows that any award for legal fees beyond that specifically proven at trial was excessive.

**{¶ 38}** Berry argues that the jury's desire to impose more damages than had been proven, along with its request to impose punitive damages even though they were not requested, shows that it was prejudiced against him.

{¶ 39} Civ.R. 59(A)(4) states that the court may grant a new trial on grounds of "[e]xcessive or inadequate damages, appearing to have been given under the influence of passion or prejudice." Because the assessment of damages is solely within the province of the jury, *Jeanne v. Hawkes Hosp. of Mt. Carmel* (1991), 74 Ohio App.3d 246, 258, 598 N.E.2d 1174, the courts do not look to the size of the award alone as proving the existence of passion or prejudice, *Pearson v. Cleveland Acceptance Corp.* (1969), 17 Ohio App.2d 239, 245, 246 N.E.2d 602. Instead, it is said that the award must be so grossly disproportionate as to shock the sensibilities. *Airborne Express, Inc. v. Sys. Research Laboratories, Inc.* (1995), 106 Ohio App.3d 498, 510, 666 N.E.2d 584; *Toledo, C. & O. RR. Co. v. Miller* (1923), 108 Ohio St. 388, 140 N.E. 617.

{¶ 40} Although the damages awarded were excessive in relation to that requested and proven at trial, that fact alone is not enough to warrant reversal for a new trial. As we have recounted, there was more than enough competent, credible evidence to support the jury's finding that Berry breached his settlement agreement with Wachovia, so we can affirm the liability aspect of the jury's verdict separately from the issue of damages.

{¶ 41} In *Dardinger v. Anthem Blue Cross & Blue Shield*, 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, the Supreme Court stated:

{¶ 42} "The court in *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus, set forth the four criteria necessary for a court to order a remittitur: (1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages."

{¶ 43} The damages sought by Wachovia were unliquidated, and we have found that the jury's verdict was supported by competent, credible evidence. A question that remains is whether the damages were the product of passion and prejudice. This means that they must be so grossly

disproportionate as to shock sensibilities. *Pena v. Northeast Ohio Emergency Affiliates, Inc.* (1995), 108 Ohio App.3d 96, 104, 670 N.E.2d 268.

{¶ 44} The jury awarded Wachovia almost three times what it requested. This was plainly excessive, but excessiveness by itself does not prove passion and prejudice. The jury could have concluded that the evidence showed that Berry acted opportunistically by demanding the return of the money that he gave to Wachovia in settlement of the Merrill Lynch dispute. This was a logical conclusion given Berry's demand, made by counsel, that he wanted "millions" to settle the Merrill Lynch arbitration. This was an entirely unrealistic demand, the futility of which was all the more apparent because Berry knew that if no settlement were forthcoming (Merrill Lynch would not settle with him alone), Wachovia would have to bear the costs of arbitration. In short, the jury could have found Berry's conduct throughout to be of a kind that justified, albeit erroneously, more damages than those requested by Wachovia. Viewed this way, the award is not shocking to the senses in a manner that shows passion and prejudice. We are confident that any error in the damages award did not influence the substantive finding that Berry breached the settlement agreement. The court did not err by refusing to order a new trial on liability grounds.

{¶ 45} As a court of appeals, we have the same power and control of verdicts and judgments as the trial court and may exercise our independent judgment on questions of excess damages if no passion or prejudice is apparent on the record. *Duracote Corp. v. Goodyear Tire & Rubber Co.* (1983), 2 Ohio St.3d 160, 162-163, 186, 443 N.E.2d 184. We can thus modify and affirm the judgment by ordering a remittitur with the consent of the prevailing party. Id., citing *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186.

{¶ 46} Unlike tort cases in which the jury is required to award compensation based on abstract calcula of pain and suffering or future damages, this contract case presented an easily

ascertainable damage award in the form of the legal fees expended to enforce the settlement agreement. As noted, Wachovia asked the jury to award it $133,691 as the amount of the fees and expenses it had incurred in defending the case. Although it now maintains that the damage award was not excessive, Wachovia notes that remittitur exists as an alternative to a new trial. We agree. We therefore grant Wachovia the option of accepting a remittitur of the damages award to $133,691—the amount that Wachovia requested and proved at trial. Wachovia may, no later than ten days after the date on which this judgment entry is issued, agree to accept this option for remittitur or a new trial on all issues will be ordered. See *Burke v. Athens* (1997), 123 Ohio App.3d 98, 102, 703 N.E.2d 804, ¶ 78; *Harris v. Univ. Hospitals of Cleveland* (Mar.7, 2002), 8th Dist. No. 76724.

B

{¶ 47} Berry next argues that the court abused its discretion by refusing to grant him a new trial under Civ.R. 59(A)(1), which allows a new trial upon a showing of irregularity in the proceedings of the court or jury not caused by the movant. He claims that the attorney hired by Wachovia for the arbitration proceedings, attorney William Falin, unfairly represented Wachovia in this breach-of-contract action by refusing to disqualify himself voluntarily during the discovery phase and then invoking the attorney-client privilege to avoid answering questions during cross-examination that Berry claims would have benefited his case.

{¶ 48} For purposes of Civ.R. 59(A)(1), an "irregularity" is a departure from the due, orderly, and established mode of proceeding, whereby a party, through no fault of his own, is deprived of some right or benefit otherwise available to him. *Reeves v. Healy*, 10th Dist. No. 10AP-418, 2011-Ohio-1487, ¶ 18. Berry's claim of irregularity is premised on his opinion that Falin should not have been allowed to represent Wachovia. The court disagreed with Berry and

twice denied his motions to compel Falin's withdrawal. Whether or not this was an error, it did not constitute an irregularity for purposes of Civ.R. 59(A)(1).

{¶ 49} Moreover, the record shows that Falin did voluntarily withdraw from the case prior to trial because he concluded that he might be called as a witness. If he was no longer representing Wachovia at the time of the trial, there could be no irregularity that affected the trial.

{¶ 50} Finally, we note that it was Berry who called Falin as a witness, not Wachovia. Falin's presence as a trial witness was thus Berry's doing. Even if we were to find that Falin gave slanted testimony (a finding we decidedly do not make), that irregularity was caused by Berry's decision to call as a witness someone who he claimed all along was beholden to Wachovia. Berry alone is responsible for Falin testifying and cannot claim error when he caused the situation giving rise to the alleged error. See *Allin v. Hartzell Propeller, Inc.*, 161 Ohio App.3d 358, 2005-Ohio-2751, 830 N.E.2d 413, ¶ 17.

C

{¶ 51} Finally, Berry claims that the court erred by refusing to grant him a new trial under Civ.R. 59(A)(2) on grounds of misconduct by the jury or the prevailing party.

{¶ 52} The argument going to jury misconduct does nothing more than repeat those made in relation to the excessiveness of the jury award. We addressed those arguments in the context of Civ.R. 59(A)(5) and incorporate that reasoning to this assignment of error.

{¶ 53} Berry argues that Wachovia engaged in misconduct by ignoring two motions in limine granted by the court: one excluded evidence of prior legal proceedings by the parties and the other excluded mention of a lawsuit that Berry filed against a home contractor. Objections to questions that were the subject of the alleged violations of the pretrial order were sustained by the court, and at one point, the court ordered the jury to disregard the question. We presume that the

jury followed the court's instructions, so no error is manifest. *State v. Raglin* (1998), 83 Ohio St.3d 253, 264, 699 N.E.2d 482.

{¶ 54} Finally, Berry complains that Wachovia's counsel acted improperly during closing argument by calling him a bully and equating him with Captain Hook, who Berry says is "one of the most notoriously evil characters recognized by the majority of society."

{¶ 55} "'[A] judgment will not be reversed on the grounds of misconduct in closing arguments unless the circumstances are of such reprehensible and heinous nature as to constitute prejudice.'" *Hinkle v. Cleveland Clinic Found.*, 159 Ohio App.3d 351, 2004-Ohio-6853, 823 N.E.2d 945, ¶ 67, quoting *Hitson v. Cleveland* (Dec. 13, 1990), 8th Dist. No. 57741, citing *Plavcan v. Longo* (July 3, 1980), 8th Dist. No. 39964. Wachovia's counsel should not have referred to Berry as a bully, nor should he have compared Berry to Captain Hook, and we do not condone such trial tactics. See *Secrest v. Gibbs*, 11th Dist. No. 2003-L-083, 2005-Ohio-2074, ¶ 87. Nevertheless, these references were not so reprehensible or heinous that we can confidently say that they compelled the jury's verdict. The trial court reached the same conclusion and we necessarily defer to it because the judge was in the better position to determine whether the remarks prejudiced Berry so as to require a new trial.

Judgment affirmed

as modified.

BLACKMON, P.J., and CELEBREZZE, J., concur.