[Cite as *Higgins v. Ranasinghe*, 2014-Ohio-4674.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 100722**

## TANYA HIGGINS

PLAINTIFF-APPELLANT

vs.

## ELIZABETH RANASINGHE, M.D., ET AL.

DEFENDANTS-APPELLEES

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-12-781936

**BEFORE:** Rocco, P.J., E.A. Gallagher, J., and Kilbane, J.

**RELEASED AND JOURNALIZED:** October 23, 2014

**ATTORNEY FOR APPELLANT**

Brian J. Darling
Darling/Duffy Legal Services
23823 Lorain Rd., Suite 270
North Olmsted, Ohio 44070

**ATTORNEYS FOR APPELLEES**

Clifford C. Masch
Thomas B. Kilbane
Christine S. Santoni
Brian D. Sullivan
Reminger Co., L.P.A.
101 West Prospect Ave., Suite 1400
Cleveland, Ohio 44115-1093

KENNETH A. ROCCO, P.J.:

**{¶1}** Plaintiff-appellant Tanya Higgins appeals from a jury verdict in favor of defendants-appellees Elizabeth Ranasinghe, M.D. and Family Medicine & Occupational Health Center, Inc. (collectively, "appellees") on her medical malpractice claim. Higgins alleged that Dr. Ranasinghe was negligent in failing to recommend that Higgins undergo screening mammograms[1] for breast cancer before she turned 40 and that, as a result, Higgins's breast cancer was not timely diagnosed and treated. Higgins contends that the jury's finding that Higgins failed to prove by a preponderance of the evidence that Dr. Ranasinghe deviated from the standard of care in her medical care and treatment of Higgins was against the manifest weight of the evidence. Finding no merit to the appeal, we affirm.

**Factual Background**

**{¶2}** Dr. Ranasinghe, a board-certified family medicine practitioner, is the sole owner/shareholder of Family Medicine & Occupational Health Center, Inc. At the time of trial, Dr. Ranasinghe had been practicing family medicine for nearly 22 years. Higgins was a patient of Dr. Ranasinghe. Higgins first saw Dr. Ranasinghe in June 1995, when she was 23, to obtain a pap smear and to discuss birth control issues. This

---

[1]A screening mammogram, as opposed to a diagnostic mammogram, occurs when a woman has no signs or symptoms of breast cancer. Multiple views of the breast are taken to determine if any abnormalities are present. A diagnostic mammogram occurs where an abnormal finding is observed, such a lump or inflamed lymph node, and is directed to a particular area to investigate that finding.

initial visit was an "acute visit," designed to address a specific complaint or concern. Dr. Ranasinghe, therefore, did not perform a complete physical examination of Higgins at that time, but recommended that Higgins follow up and schedule a physical examination. Higgins continued to be one of Dr. Ranasinghe's patients for the next 16 years, seeing Dr. Ranasinghe on and off for various issues, including eczema, back pain, sinus issues, urinary tract infections, numbness and tingling in her arm, and abdominal pain.

{¶3} Higgins's breast issues began in 2001, when she was 29. In April 2001, Higgins visited Dr. Ranasinghe, complaining of swelling in her armpits. Dr. Ranasinghe initially diagnosed Higgins with a rash and treated her for eczema. After several followup visits with the same complaint, Dr. Ranasinghe noticed a lump under Higgins's left armpit. Dr. Ranasinghe recommended that Higgins undergo a diagnostic mammogram and referred her to a surgeon, Dr. Aszodi. The mammogram revealed that Higgins had a small tumor. Dr. Aszodi removed the tumor, a biopsy was performed, and it was determined to be benign.

{¶4} In May 2002, Higgins returned to Dr. Ranasinghe with complaints regarding an abnormality in her left armpit. Following an examination, Dr. Ranasinghe discovered what appeared to be extra skin tissue under Higgins's left arm. Dr. Ranasinghe referred Higgins to a plastic surgeon, Dr. Goldman, for further evaluation. Dr. Goldman recommended that Higgins have a screening mammogram "since the patient has not had one in over a year" and that the excess tissue be removed. Higgins did not immediately follow his recommendations. In May 2003, Higgins returned to Dr. Ranasinghe with

continued complaints regarding an abnormality in her left arm. Dr. Ranasinghe again referred Higgins to Dr. Goldman. Higgins underwent the mammogram previously ordered by Dr. Goldman, and Dr. Goldman performed plastic surgery on Higgins's underarm, removing both axillary and breast tissue. The mammogram was normal, revealing no abnormalities, and a biopsy determined that the removed tissue was noncancerous.

{¶5} In October 2003, Higgins saw Dr. Ranasinghe with a complaint that her left breast was larger than her right breast. Dr. Ranasinghe determined that this was likely due to the scar tissue from her prior surgery, but referred Higgins to a surgeon to confirm her diagnosis. Higgins did not follow up with the surgeon. Higgins continued to see Dr. Ranasinghe intermittently for various other health issues over the next several years but did not mention any problems with her breasts.

{¶6} Although the May 2001 report from Higgins's first mammogram indicated that Higgins had a family history of breast cancer, Dr. Ranasinghe did not herself note in Higgins's chart that Higgins had a family history of breast cancer until 2007. Dr. Ranasinghe admitted that, on several occasions during 2003 through 2005 in connection Higgins's "acute visits" to her office for various unrelated complaints, she inaccurately recorded that Higgins's family history was "negative" or otherwise failed to note that Higgins had a family history of breast cancer. Dr. Ranasinghe testified that she typically has a patient fill out a detailed family history form the first time she sees a patient, i.e., when Higgins first visited her in 1995, and then updates the patient's family history

during the patient's annual physical or "well woman" visit. She testified that it is not her practice to go over a patient's family history or to ask patients about changes in their family history when they come in for acute visits, only during annual physicals or "well woman" visits.

{¶7} In December 2007, at age 35, Higgins saw Dr. Ranasinghe for her first of several annual physicals or "well woman" visits. During that visit, Dr. Ranasinghe asked Higgins about her medical and family history. Dr. Ranasinghe testified that Higgins told her only that her mother had had breast cancer but did not indicate that any other family members had had breast cancer. Dr. Ranasinghe testified that she recorded that information in Higgins's chart. She further testified that although she asked Higgins the age at which her mother had been diagnosed with breast cancer, she did not record that information. Dr. Ranasinghe explained that because Higgins's mother was postmenopausal rather than premenopausal when she was diagnosed with breast cancer, Higgins's mother's age at the time of her diagnosis "was not an issue for me." As part of Higgins's physical, Dr. Ranasinghe performed a clinical breast exam and determined that both breasts were normal. Dr. Ranasinghe testified that after she completed the exam, she discussed the results with Higgins, as well as the fact that at age 40, she would order an additional mammogram for her. Dr. Ranasinghe testified that preventative medicine was an important part of her practice and that she also discussed with Higgins measures Higgins could undertake in an attempt to prevent cancer, including proper nutrition, weight control, and exercise, and showed her how to perform self breast exams. Dr.

Ranasinghe did not document her discussion with Higgins regarding screening for the early detection of breast cancer in Higgins's medical records.

**{¶8}** After her 2007 visit, Higgins once again continued to see Dr. Ranasinghe intermittently for various health issues — none of which involved any issues with her breasts. In May 2009 and May 2010, Higgins saw Dr. Ranasinghe again for annual physicals. Dr. Ranasinghe testified that at each visit, she updated Higgins's family history but that Higgins made no mention of any other relatives with breast cancer. Dr. Ranasinghe testified that during each visit, she also performed a clinical breast exam. No abnormalities in Higgins's breasts were discovered during these exams. Dr. Ranasinghe further testified that although she did not make a specific notation in Higgins's records to that effect, she discussed both breast cancer prevention and screening mammograms with Higgins at these well women visits, including the plan to order a further screening mammogram for Higgins at age 40.

**{¶9}** Higgins testified that in addition to her mother, who developed breast cancer in 1997 at age 53, she had a paternal grandmother who developed breast cancer when she was in her 80s, paternal and maternal aunts who developed breast cancer, and two cousins on her mother's side who developed breast cancer in their 30s. Higgins testified that she told Dr. Ranasinghe in 1995 that her paternal grandmother had had breast cancer but that Dr. Ranasinghe dismissed it, stating that she "doesn't consider that." With respect to other family members who later developed breast cancer, Higgins testified that she told

Dr. Ranasinghe about them when she learned of them, such that Dr. Ranasinghe would have known of her complete family history of breast cancer by 2008.

{¶10} Higgins testified that because she was afraid of contracting breast cancer, she "started really asking" Dr. Ranasinghe for mammograms in 2004. Higgins testified that on each of her annual visits, i.e., five or six times before 2011, she requested that Dr. Ranasinghe order a screening mammogram for her. Higgins testified that each time she requested a mammogram, she explained to Dr. Ranasinghe that she wanted a mammogram because of her prior surgeries and family history of breast cancer. Higgins testified, however, that Dr. Ranasinghe refused her requests, stating that she did not need a mammogram until she was 40. Although Higgins acknowledged that she could have seen another doctor if she wanted a mammogram and was dissatisfied with the treatment she was receiving from Dr. Ranasinghe, Higgins testified that she trusted Dr. Ranasinghe and went to her for "everything" unless referred elsewhere by Dr. Ranasinghe. With the exception of the mammograms, Higgins testified that she could not recall another instance in which she had requested a referral from Dr. Ranasinghe but that her request had been refused.

{¶11} Higgins's daughters, 20-year-old India Higgins ("India") and 23-year-old Shantelle Carr ("Carr"), also testified regarding Higgins's request for a mammogram. Higgins's daughters described their relationship with their mother as "close" and "like best friends." Carr testified that her mother was concerned about getting breast cancer and "always talked about mammograms." She testified that her mother had told her that

she had requested a mammogram from Dr. Ranasinghe but that Dr. Ranasinghe had refused her request because a mammogram was not recommended until Higgins was 40.[2] India testified that she accompanied her mother on her mother's visits to Dr. Ranasinghe and that, beginning when India was 10 or 11, was present in the exam room when Higgins requested mammograms from Dr. Ranasinghe. India testified that she heard her mother ask Dr. Ranasinghe "constantly, over five times * * * can I get a mammogram" but that each time Dr. Ranasinghe refused her request, stating that she could wait until she was 40 to get a mammogram. With respect to what Higgins should do to prevent breast cancer, India testified that Dr. Ranasinghe simply told Higgins to exercise and eat healthier. Although they both knew their grandmother had had breast cancer, India and Carr testified that they did not learn of their full family history of breast cancer until after their mother was diagnosed with cancer.

{¶12} Dr. Ranasinghe testified that, notwithstanding Higgins's mother's history of breast cancer, she did not start ordering screening mammograms for Higgins at age 35 because she followed the guidelines of the American Academy of Family Physicians ("AAFP"). She testified that the AAFP did not recommend that a patient such as

---

[2]At trial, counsel for Dr. Ranasinghe attempted to impeach Carr with her prior deposition testimony regarding this issue. At her deposition, when Carr was asked "Did [Higgins] ever say she wanted to go get a mammogram and someone wouldn't let her go get one," she testified, "No. They weren't recommended till she was 40."

Higgins, with the family history of breast cancer that was known to Dr. Ranasinghe at the time, receive screening mammograms before the age of 40.[3]

{¶13} Dr. Ranasinghe denied that Higgins had ever asked her for mammogram. She testified that had Higgins done so, she would have had a discussion with her about the difficulties, given her age and dense breast tissue, of finding a lesion — even if one existed — and concerns regarding false positives. She further testified that, if following such a discussion, Higgins had still wanted a mammogram, she "would have granted her request without any objection."

{¶14} Higgins last saw Dr. Ranasinghe on September 3, 2011, for an annual physical. During her examination of Higgins, Dr. Ranasinghe noticed that Higgins's left breast appeared asymmetric and that there was an indentation or dimple on the lower portion of the breast. Concerned these abnormalities might be indicative of cancer, Dr. Ranasinghe referred Higgins to a surgeon, Dr. Carl Johnson, to investigate them. Dr. Johnson ordered a diagnostic mammogram. The mammogram showed signs of possible

---

[3] On cross-examination, Dr. Ranasinghe admitted that the AAFP breast screening recommendations, by their terms, did not apply to women who had an "increased risk" of developing breast cancer and that, based on her family history, Higgins had a "slightly increased risk" or "higher risk" than the average person of developing breast cancer. It is unclear from the record precisely what the AAFP recommended with respect to breast screening and what constituted an "increased risk" for developing breast cancer within the meaning of those recommendations. It is likewise unclear from the record whether the AAFP recommended an alternative time line for performing screening mammograms on women with an "increased risk" of breast cancer or was silent on the issue, providing no recommendations regarding the timing or frequency of screening mammograms for women with an "increased risk" of developing breast cancer. The AAFP recommendations were not admitted into evidence at trial and, therefore, are not part of the record on appeal.

breast cancer, so he ordered a number of follow up tests, including an ultrasound, CT scans, MRIs, and a biopsy. In November 2011, at age 39, Higgins was diagnosed with stage 4 breast cancer with metastatic disease to her bones. During the months that followed, Higgins underwent chemotherapy, had a mastectomy followed by a course of radiation, and her ovaries and fallopian tubes were removed.

**Expert Testimony**

{¶15} At trial, both parties offered expert medical testimony on the issue of the standard of care. Dr. Jeffrey Soffer, a board-certified obstetrician-gynecologist, was one of the medical experts who testified on Higgins's behalf. He testified that a family doctor providing gynecological services must provide the same standard of care as a gynecologist. He testified that, in his practice, if a woman has no family history of breast cancer, he would recommend yearly mammograms beginning at age 40. He testified, however, that if a woman has a significant family history of breast cancer, then he would discuss performing mammograms before the age of 40 and would "probably * * * start doing them routinely" at age 30 or 35.

{¶16} Dr. Soffer further testified that the American Cancer Society recommends that if a woman has the gene for breast cancer or a strong family history of breast cancer, that annual mammograms begin at age 30. He testified that whereas the average woman, without any family history of breast cancer or other risks, has a 12.5% chance of developing breast cancer during her lifetime, that risk increases to 25% where a first-degree relative, i.e., a mother, daughter, or sister, has had breast cancer, and that if

second-degree relatives, i.e., cousins or aunts, have also developed breast cancer, it could increase the risk "maybe up to 30 percent" that the woman would develop breast cancer during her lifetime.[4] He testified that other risks of breast cancer include prior biopsies and that African-American women have a higher incidence of breast cancer under age 40.

{¶17} Based on his review of the medical records, Dr. Soffer testified that Dr. Ranasinghe should have known that Higgins's family history and prior biopsies put her at an increased risk for breast cancer and that based on this risk (1) screening mammography should have been started much earlier and (2) she should have had several discussions with Higgins regarding why screening mammography was recommended.[5] He opined that the standard of care for a woman with two biopsies and a mother who developed breast cancer would be to start screening mammograms "in the 30s, probably at age 30," "continue [them] every year or every two years until 40[,] and then at 40[,] do them every year," and that, in failing to do so, Dr. Ranasinghe breached the standard of care. Dr.

---

[4] Dr. Ranasinghe's counsel challenged these percentages. On cross-examination, Dr. Soffer admitted that using the Gail model, a widely-accepted means of assessing a woman's individual risk of developing breast cancer during her lifetime, he calculated Higgins's lifetime breast cancer risk at less than 16%. Dr. Soffer testified, however, that the Gail model calculation did not accurately reflect Higgins's risk because the model is known to underestimate the breast cancer risk in African-American women who have had one or more biopsies and does not allow for the consideration of second- or third-degree relatives who have developed breast cancer in calculating risk.

[5] It is undisputed that Higgins does not have the BRCA gene, a gene approximately 10% of women carry that puts them at a 80% risk of developing breast cancer. Genetic testing was performed on Higgins after she was diagnosed with breast cancer that revealed that she did not have the BRCA gene. At trial, Dr. Soffer opined that Dr. Ranasinghe should have ordered genetic testing sooner to see if Higgins had the gene, but acknowledged that because Higgins does not carry the gene, "it really didn't impact this situation."

Soffer further opined that even if early mammography had not been warranted based on Higgins's risk factors alone, the standard of care required that, if Higgins had asked for a mammogram, a mammogram be ordered for her. He also testified that Dr. Ranasinghe's failure to accurately record information in Higgins's records, including the age at which her mother developed breast cancer and Higgins's complete family history of breast cancer, was a breach of the standard of care. Dr. Soffer opined that if Higgins had underwent additional screening mammograms sooner, there is a "very high degree of medical certainty" that her cancer would have been diagnosed earlier and treatment begun sooner such that "she would have had a much lesser stage of the disease."[6]

{¶18} Dr. Ranasinghe's experts, Dr. Howard Muntz, a board-certified gynecological oncologist, and Dr. Benjamin Hasan, a board-certified physician in family medicine and sports medicine, offered a contrary view. Dr. Muntz opined that Dr.

---

[6] Dr. David Harris, a board-certified medical oncologist, also testified on behalf of Higgins. His testimony related primarily to causation. He explained the various stages of ductile carcinoma, the type of cancer with which Higgins was diagnosed, and testified that certain changes indicative of cancer can often be viewed on a mammogram several years before a lump develops in the breast. He testified that before the cancer became invasive, calcifications would form in the breast and opined that if Higgins had had a mammogram in 2005 or 2006, these calcifications would have likely been visible on the mammogram. He further opined that based on the average growth rates of tumors similar to Higgins's — applying a doubling time theory to look backwards and determine what the size of the tumor would have been at various times — the tumor itself would have likely been detectable in a mammogram in 2009 or 2010. Thus, Dr. Harris concluded, if a screening mammogram had been performed on Higgins before 2011, Higgins's cancer would have been detected earlier, and she could have begun treatment at an earlier stage of the disease, significantly increasing her chances of survival. He offered no opinion regarding when mammogram screening should have been ordered for Higgins, given her risk factors, or whether Dr. Ranasinghe's failure to order early mammograms for Higgins breached the standard of care.

Ranasinghe met the standard of care for screening mammography, testifying that early mammography, i.e., mammography before age 40, was not recommended by any of the "academies or societies" for patients like Higgins. He testified that the American College of Obstetricians and Gynecologists ("ACOG") recommends starting mammography at age 40 and that, even for women with a family history of breast cancer, the U.S. Preventative Task Force and AAFP recommend starting mammograms at age 50. He explained that early mammography is not generally recommended because (1) the incidence of breast cancer in young women is "really low" and (2) mammography is "really not very accurate" in women under age 40 due to their dense breast tissue. He testified that early mammography "misses most of the cancers" and results in a number of "false positives," which can lead to additional diagnostic tests and, in some instances, surgery to diagnose mammographic abnormalities. Dr. Muntz opined that even if an earlier mammogram had been performed on Higgins in her 30s, it would not likely have been helpful in the diagnosis of her cancer due to the inherent inaccuracy of mammography in young patients and his view that Higgins had a very rapidly growing cancer that would not have been detectable in earlier diagnostic tests.

{¶19} Dr. Muntz disputed Dr. Soffer's contention that if a woman has a family history of breast cancer, has had biopsies, and is African-American, she should get a mammogram before the age of 40. He likewise disputed that the American Cancer Society recommended mammography before age 40 for patients like Higgins.[7] On

_____

[7]The American Cancer Society recommendation referenced at trial apparently states as

cross-examination, Dr. Muntz acknowledged that the AAFP guidelines, upon which Dr. Ranasinghe indicated she relied, state that they are not intended to apply to women with an increased risk of breast cancer. He testified, however, that where such guidelines do not apply, i.e., for patients who have an "increased risk" of developing breast cancer, mammography would be recommended to begin at age 40, rather than age 50 — not when a woman is in her 30s. He did agree, however, that Dr. Ranasinghe would have breached the standard of care if she had failed to ask Higgins about her family history of breast cancer or if she had failed to ask Higgins the age at which her mother was diagnosed with breast cancer.

{¶20} Dr. Hasan offered similar testimony. He testified that, taking into account Higgins's risk factors, including her mother's breast cancer, mammogram screening was not recommended until age 40 based on guidelines from the U.S. Preventative Health Task Force and ACOG, and that the prior breast issues and mammograms Higgins had had in 2001-2003 did not alter the timing for ordering a mammogram. Dr. Hasan echoed Dr. Muntz's concerns regarding ordering mammograms too early and opined that Dr. Ranasinghe met the standard of care in her treatment of Higgins by not ordering a screening mammogram for Higgins before age 40. He testified that he disagreed with recommendations by the American Cancer Society and that he also disagreed that the

---

follows: "In younger women who are at high risk for developing breast cancer due to gene mutation or strong family history, yearly mammograms and breast MRIs are recommended. For most, these screenings should begin at 30 and continue as long as the woman is in good health." None of the experts testified as to whether there is an accepted definition of what constitutes a "strong family history" within the meaning of the recommendation.

incidence of breast cancer in second- and third-degree relatives presents an increased risk of breast cancer to a patient. He testified that Dr. Ranasinghe's practice of taking a detailed family history only during annual physical examinations and that her errors in noting in Higgins's medical records that Higgins had no adverse family history, during several acute visits in which no family history of breast cancer was discussed, did not constitute a breach of the standard of care under the circumstances.

{¶21} After considering all the evidence, the jury found that Higgins did not establish by a preponderance of the evidence that Dr. Ranasinghe had deviated from the standard of care in her medical care and treatment of Higgins and entered a verdict in favor of appellees. On November 6, 2013, the trial court entered judgment on the jury's verdict.

{¶22} Higgins appeals the trial court's judgment, raising a single assignment of error for review:

> The jury verdict in favor of defendants was against the manifest weight of the evidence.

**Elements of a Medical Malpractice Claim**

{¶23} To recover on a claim of medical malpractice, a plaintiff must prove by a preponderance of the evidence: (1) the existence of standard of care within the medical community, (2) a breach of that standard of care by the defendant, and (3) proximate cause between the medical negligence and the injury sustained. *O'Connor v. Fairview*

*Hosp.*, 8th Dist. Cuyahoga No. 98721, 2013-Ohio-1794, ¶ 24, citing *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130-131, 346 N.E.2d 673 (1976).

{¶24} As the Ohio Supreme Court explained the plaintiff's burden in *Bruni*:

Under Ohio law, as it has developed, in order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or commission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things.

*Bruni* at 131. Expert testimony is generally required both to establish that a physician was negligent, i.e., that the physician breached a standard of care in the medical community, and to establish a causal link between the alleged negligent act or omission and the injury sustained. *O'Connor* at ¶ 26, citing *Bruni* at 130.

**Manifest Weight of the Evidence**

{¶25} Higgins asserts that the trial court's judgment should be reversed and a new trial ordered because the jury's verdict in favor of appellees was against the manifest weight of the evidence. Higgins argues that the "greater amount of credible evidence,"

including the testimony of both parties' experts, supported a finding that appellees breached their standard of care.

**{¶26}** The manifest weight of the evidence involves a party's burden of persuasion and is "quantitatively and qualitatively different from" the sufficiency of the evidence. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19, 23. In *Eastley*, the Ohio Supreme Court made it clear that the *Thompkins* standard of review for manifest weight of the evidence applies in civil as well as criminal cases. *Id.* at ¶ 17. In *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541, the Ohio Supreme Court described manifest weight of the evidence as follows:

> Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."

(Emphasis omitted.) *Id.* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990).

**{¶27}** In assessing whether a jury's verdict is against the manifest weight of the evidence, we examine the entire record, weigh the evidence and all reasonable inferences, consider the witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered. *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

**{¶28}** In weighing the evidence, we are, however, guided by a presumption that the findings of the trier of fact are correct. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). This presumption arises because the trier of fact had an opportunity "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Id.* Thus, "to the extent that the evidence is susceptible to more than one interpretation," we will "construe it consistently with the jury's verdict." *Berry v. Lupica*, 196 Ohio App.3d 687, 2011-Ohio-5381, 965 N.E.2d 318, ¶ 22 (8th Dist.), citing *Ross v. Ross*, 64 Ohio St.2d 203, 414 N.E.2d 426 (1980); *see also Seasons Coal* at 80, fn. 3 ("'[I]n determining whether the judgment below is manifestly against the weight of the evidence, every reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts.

* * * If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'"), quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 60, at 191-192 (1978).

**{¶29}** Higgins argues that the jury's determination that Higgins did not establish, by a preponderance of the evidence, that Dr. Ranasinghe deviated from the standard of care in her medical care and treatment of Higgins was against the manifest weight of the evidence based on: (1) Dr. Ranasinghe's admissions that, on several occasions prior to 2007, she failed to accurately record Higgins's family history of cancer in Higgins's

medical records, (2) the testimony of Higgins and her daughters that Higgins had asked Dr. Ranasinghe to order screening mammograms for her but that Dr. Ranasinghe refused to do so, and (3) expert testimony establishing that given Higgins's family history of breast cancer, her prior biopsies, and the increased incidence of breast cancer in African-American women under age 40, Higgins had an increased or high risk of breast cancer that warranted her receipt of screening mammograms in her 30s. We disagree.

{¶30} In this case, the jury was presented with competing opinions from qualified experts regarding what constituted the applicable standard of care and whether that standard of care was breached by Dr. Ranasinghe under the circumstances. The parties' experts based their opinions on different (and, at times, potentially conflicting) recommendations from different organizations regarding whether screening mammography should be ordered for women under age 40 and offered different interpretations as to the extent to which those recommendations applied to Higgins given the information that was allegedly known by (or should have been known by) by Dr. Ranasinghe at the time. In addition, the witnesses offered conflicting testimony on a number of factual issues relevant to the determination of whether Dr. Ranasinghe breached the standard of care, including whether Dr. Ranasinghe ever discussed screening mammograms with Higgins, whether Higgins ever asked Dr. Ranasinghe for a screening mammogram (and, if so, whether Dr. Ranasinghe refused that request), whether Dr. Ranasinghe asked Higgins at what age her mother was diagnosed with breast cancer, and when or whether Higgins disclosed her full family history of breast cancer to Dr.

Ranasinghe. Although we consider credibility in a manifest weight challenge, we are mindful that it is primarily within the jury's province to make determinations as to the weight of the evidence and the credibility of witness testimony. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶31} Following a complete and careful review of the record, we cannot say that, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the verdict must be overturned and a new trial ordered. As such, we find that the jury's verdict was not against the manifest weight of the evidence, and we decline to disturb it. *See, e.g.*, *Welsh v. Ford Motor Co.*, 8th Dist. Cuyahoga No. 94068, 2011-Ohio-448, ¶ 42 (where testimony of competing experts with opposite opinions was presented to the jury such that the evidence was susceptible to more than one interpretation, the jury's verdict was not against the manifest weight of the evidence); *O'Connor*, 2013-Ohio-1794 at ¶ 58 (where jury was presented with competing opinions as to the cause of plaintiff's injuries, jury's verdict in favor of plaintiff and against hospital on medical malpractice claim was not against the manifest weight of the evidence). Higgins's assignment of error is overruled.

{¶32} Judgment affirmed.

It is ordered that appellees recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
KENNETH A. ROCCO, PRESIDING JUDGE

EILEEN A. GALLAGHER, J., and
MARY EILEEN KILBANE, J., CONCUR