[Cite as *Wehr v. Petraglia*, 2016-Ohio-3126.]

STATE OF OHIO, COLUMBIANA COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT


MYRON C. WEHR PROPERTIES, LLC    )    CASE NO. 14 CO 7
                                 )
    PLAINTIFF-APPELLEE       )
    CROSS-APPELLANT          )
                                 )
VS.                              )    OPINION
                                 )
JAMES F. PETRAGLIA, EXECUTOR     )
OF THE ESTATE OF CATHERINE T.    )
PETRAGLIA                        )
                                 )
    DEFENDANT-APPELLANT      )
    CROSS-APPELLEE           )

CHARACTER OF PROCEEDINGS:    Civil Appeal from the Court of Common
                             Pleas of Columbiana County, Ohio
                             Case No. 2011 CV 858

JUDGMENT:                    Affirmed.

APPEARANCES:
For Plaintiff-Appellee:      Atty. Timothy A. Barry
                             Fitch, Kendall, Cecil,
                             Robinson & Barry Co., LPA
                             600 East State Street
                             P.O. Box 590
                             Salem, Ohio  44460

For Defendant-Appellant:     Atty. Kevin P. Murphy
                             Atty. Matthew M. Ries
                             Harrington, Hoppe & Mitchell, Ltd.
                             108 Main Avenue, S.W., Suite 500
                             Warren, Ohio  44481

JUDGES:
Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

Dated:  May 16, 2016

WAITE, J.

**{¶1}** Appellant, James F. Petraglia ("James"), Executor of the Estate of his mother, Catherine T. Petraglia ("Catherine"), appeals the trial court judgment entry granting a motion to enforce a settlement agreement in favor of Appellee, Myron C. Wehr Properties, LLC ("Wehr").

**{¶2}** In April 2011, the parties signed a contract for the sale of land ("contract") wherein Wehr was to purchase approximately one hundred (100) acres of farmland ("the property") from Catherine for $380,450.00. The property had certain encumbrances, including an oil and gas lease which was scheduled to expire in May of 2012. The contract also included a number of contingencies, including a property survey, acceptance of the survey by Catherine, and transfer at closing by means of a general warranty deed. The survey was performed in April, 2011. A protracted period of back and forth communication ultimately revealed the property was subject to both an IRS tax lien as well as a reverse mortgage encumbrance. Following a lengthy period where Catherine and her counsel failed to respond to Wehr's entreaties to set a date for closing, Wehr filed the underlying breach of contract action. The trial court recommended mediation, and the matter was apparently concluded when the parties reached a settlement agreement ("settlement"). That settlement, memorialized in writing in September of 2012, provided that Catherine would transfer the property pursuant to all of the terms of the 2011 contract, with closing to occur by December 15, 2012. Two weeks prior to the agreed closing date, Wehr received a copy of the title work which reflected that Catherine had negotiated

a new oil and gas lease for the property with Chesapeake Exploratory, LLC, in May of 2012, without his knowledge or consent.

{¶3} Wehr and Catherine filed separate motions to enforce the settlement. A hearing was held on the matter. The trial court concluded that Catherine had purposefully delayed the closing in order to negotiate the new oil and gas lease and had accepted $391,000.00 as a signing bonus; that Wehr presented evidence that the parties had discussed his ability to negotiate the new, upcoming, oil and gas lease as a basis for Wehr's purchase offer on the property of $380,450.00; and that the signing bonus Catherine received from Chesapeake was intended to be used by Wehr to offset the purchase price set forth in the April, 2011 contract. The trial court denied Wehr's motion for attorney fees in the matter and denied Catherine's motion for enforcement as well as her motion for sanctions and compensatory damages. Catherine timely appeals the trial court order. Wehr filed a cross appeal. Catherine T. Petraglia died in the intervening time period and, by order of this Court, her son James filed a notice of substitution as executor of her estate.

{¶4} The evidentiary record in this matter supports the trial court's order. The assignments of error are without merit and are overruled. Moreover, as the trial court did not abuse its discretion in denying Wehr's motion for attorney fees, Wehr's cross-assignment of error is also without merit and is overruled. The judgment of the trial court is affirmed.

Facts

**{¶5}** Appellee Myron Wehr, via Myron C. Wehr Properties, LLC, has been farming the 100 acre parcel of land with the street address of 49763 Heck Road, East Palestine, Ohio, (the "property") since the 1970s. Wehr leased this property from its owner, Catherine Petraglia. In March of 2011 Wehr was contacted by Catherine, who told him he could no longer lease the property because she was putting it up for sale. Catherine indicated she had received an offer of $3,500 per acre to buy the farm. Wehr said that he was interested in purchasing the property. Wehr subsequently engaged in discussions with both Catherine and her son, James, about the sale of the property. Catherine gave Wehr a copy of a 2007 oil and gas lease that was then in effect relative to the property. It was noted that the lease was to expire in May of 2012. Wehr testified at the hearing that the 2007 lease was discussed during the negotiations to purchase the property, as well as the status of oil and gas lease negotiations in general that were ongoing throughout Columbiana County. (Tr., p. 17.) Wehr also testified that Catherine indicated that current leases were offering approximately $2,000 an acre and, as he had offered $3,850 an acre, once he bought the property he could recoup some of his purchase price through the negotiation of a new oil and gas lease. (Tr., p. 17.)

**{¶6}** On April 5, 2011, the parties entered into an Offer to Purchase Real Estate and Acceptance – Vacant Land ("contract"). The document was drafted by Catherine, a retired attorney. (Tr., Exh. B.) The contract contained a number of pertinent provisions including, "Conditions of Sale" which indicated, "1. Sale subject to BUYER'S and SELLER'S acceptance and approval of survey of PROPERTY. (2)

The transfer of the PROPERTY shall include the transfer of all mineral rights and all oil and gas rights." *Id.* Furthermore, the contract contained a clause entitled, "TITLE" which provides:

> BUYER agrees to pay the purchase price upon the presentation to BUYER of a general warranty deed conveying the premises free and clear of any encumbrances except zoning ordinances, easements, restrictions, leases, conditions, rights of way of record and real estate taxes and assessments.

**{¶7}** Wehr testified that the survey was completed sometime in May or June of 2011 and that he paid his half of the survey expenses at that time pursuant to the terms of the contract. Wehr contacted Myron Smith at Farm Credit, the banker with whom he had worked with for approximately thirty-five years. Smith testified that he had the loan documents finalized and approved on May 6, 2011. (Tr., p. 77.)

**{¶8}** The contract specified that a specific title agency, Commerce Title Agency of Youngstown, LLC, was to "coordinate and conduct the preparation of the title work, title insurance and closing of [the] transaction." (Tr., Exh. B.) Several weeks passed with no action on the sale. Ultimately, Wehr contacted James in July of 2011 to inquire when the closing would occur. James, who is a licensed Pennsylvania attorney, informed Wehr there were problems with the title, but did not indicate specifically what those problems were. He stated only that they were working to resolve them. Wehr testified that he called again approximately thirty days

later in August of 2011 and again in September, and each time was informed there were still issues regarding the title. (Tr., p. 21.)

{¶9} Wehr next contacted Heritage Title, an agency that has done real estate work for him in the past. He asked them to do a title search on the property. Their search revealed an IRS tax lien and a reverse mortgage on the property. (Tr., Exh. C, D, and E.) It was then that Wehr sought his own legal counsel to assist in contacting the Petraglias to set closing. Wehr testified that after more "indefinite answers" as to when the closing would occur, he decided to file a breach of contract action in December of 2011. (Tr., p. 22.) In his complaint he sought specific performance of the April, 2011 purchase contract.

{¶10} The trial court referred the parties to mediation, which occurred on September 12, 2012. At mediation, the parties agreed to proceed with the terms of the 2011 purchase contract. A written settlement agreement was executed by both parties and dated November 3, 2012. An agreed dismissal entry was issued on November 14, 2012, with the trial court retaining jurisdiction to enforce the terms of the settlement agreement.

{¶11} The settlement agreement provided, *inter alia,* "[u]nless specifically modified by this Settlement Agreement, all terms and conditions set forth in the Purchase and Sale Agreement of April 5, 2011 shall remain in full force and effect." (Tr., Exh. F.) The closing was scheduled to take place on December 15, 2012. Wehr contacted Farm Credit to inform them of the pending closing on the property. He was notified shortly thereafter by Farm Credit that a subsequent title search on the

property revealed a new encumbrance, specifically a Paid-up Oil & Gas Lease that was executed on May 3, 2012, between Catherine and Chesapeake Exploration, LLC. It contained a five year lease term commencing May 25, 2012 with an additional five year extension option. The payments provision of the lease reflected that, in addition to the royalty payments, there was a bonus payment paid to Catherine for executing the lease. The amount was not specified in the lease document. James testified at the hearing that the bonus received was $390,000.00. (Tr. p. 84.) The actual bonus amount totaled $391,000.00. Wehr was never informed by either of the Petraglias of the new oil and gas lease or the bonus payment made to the Petraglias at any time leading up to the execution of the lease or after it was executed.

**{¶12}** Upon discovering the existence of the new lease, counsel for Wehr filed a motion for enforcement of the settlement agreement with the trial court on December 14, 2012, asserting that the settlement agreement required both parties to adhere to the April, 2011, contract terms. Catherine filed a cross-motion to enforce the settlement agreement on January 24, 2013, claiming that Wehr was refusing to abide by the terms of the settlement in not closing on the property on December 15, 2012. Wehr amended his motion to include a request for attorney fees relative to the motion to enforce settlement. Catherine subsequently filed a motion seeking compensatory damages and sanctions for Wehr's alleged breach of the settlement agreement.

{¶13} A hearing on all motions was finally held on August 8, 2013. Both parties presented testimony regarding the terms of the original purchase contract and subsequent conduct relative to the settlement agreement and closing on the property. Wehr also presented the testimony of Myron Smith. Smith testified about Wehr's actions in obtaining financing for the transaction and the subsequent discovery of the new lease. The parties submitted post hearing briefs on the matter. The trial court issued a judgment entry on October 2, 2013, overruling Catherine's motion to enforce settlement and granting Wehr's motion. The court ordered the parties to perform according to the terms of the settlement. In addition, the trial court ordered both parties to file post hearing briefs on the issues of attorney fees and the disposition of the $391,000.00 signing bonus.

{¶14} A follow up hearing was held on November 18, 2013, on the remaining issues. In a judgment entry dated January 9, 2014, the trial court denied Wehr's motion for attorney fees. Regarding the disbursement of the signing bonus received by Catherine from Chesapeake, the trial court awarded Wehr the $391,000.00 signing bonus subject to certain credits to Catherine. The signing bonus actually covered 112.5 acres at a payment of $3,476.00 per acre. As Wehr purchased only 100 acres, there was an offset of $43,450.00 for the acreage not included in the purchase contract. The trial court also credited Catherine $18,744.00 in legal fees for negotiating the signing bonus. Lastly, the trial court credited Catherine $5,325.00, which represents payment for Wehr's 2013 lease to farm the property. Thus, the trial court awarded Catherine a total of $67,519.00 in credits from the signing bonus,

reducing Wehr's portion of the bonus to $323,481.00. As the 2011 purchase agreement fixed the purchase price at $380,450.00, pursuant to the trial court judgment entry Wehr still owed Catherine $56,969 on the purchase contract. After incorporating the judgment entry of October 2, 2013 and unsealing all records, the trial court issued a final appealable order. Both parties subsequently appealed.

ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN GRANTING MR. WEHR'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND AWARDING MR. WEHR THE SIGNING BONUS FROM THE CHESAPEAKE LEASE.

**{¶15}** In Catherine's first assignment of error she raises two issues: whether the trial court properly granted Wehr's motion to enforce the settlement agreement and whether the trial court erred in awarding Wehr the signing bonus from the new Chesapeake lease.

**{¶16}** Settlement agreements are highly favored as a means for resolving disputes between parties because they serve to prevent or bring to a close additional litigation. *State ex rel. Wright v. Weyandt,* 50 Ohio St.2d 194, 197, 363 N.E.2d 1387 (1977). A settlement agreement is an enforceable contract resolving a legal dispute by preventing or ending litigation. *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.,* 74 Ohio St.3d 501, 502, 660 N.E.2d 431 (1996). "A contract is generally defined as a promise, or a set of promises, actionable upon breach." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770

N.E.2d 58, at ¶16, quoting *Perlmuter Printing Co., v. Strome, Inc.,* 436 F.Supp 409, 414 (N.D. Ohio 1976).  The trial court has full authority to enforce settlement agreements that have been voluntarily entered into by the parties.  *Mack v. Polson Rubber Co.,* 14 Ohio St.3d 34, 36, 470 N.E.2d 902 (1984).  In order to be enforceable, a contract must have "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or deteriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik* at ¶16.  There also must be a meeting of the minds as to the essential terms of the contract.  *Id.*

{¶17} There is a two-fold standard of review that applies to a ruling on a motion to enforce a settlement agreement.  Regarding legal questions concerning the interpretation of the settlement agreement, an appellate court is to determine whether the trial court applied an erroneous legal standard or misconstrued the law. *Continental W. Condominium Unit Owners Assn.*, *supra* at 502.  Where the question at issue is a factual or evidentiary one, the trial court's findings will not be overturned if there was sufficient evidence to support such a finding.  *Chirchiglia v. Ohio Bur. of Workers' Comp.*, 138 Ohio App.3d 676, 679, 742 N.E.2d 180 (2000).

{¶18} In the instant case, Catherine asserts that this issue strictly concerns a legal question of contract interpretation.  Specifically, whether Catherine breached the settlement agreement by entering into the Chesapeake lease and whether the Chesapeake lease's signing bonus was part of the settlement agreement. Therefore, she asks this Court to undertake a *de novo* review of the law pursuant to *Continental W. Condominium Unit Owners Assn., supra* at 502.

**{¶19}** However, a review of the record reveals there are factual matters in dispute; most notably, the intention of the parties in discussing the expiration of the existing oil and gas lease on the property at the time they entered the purchase contract and if it had any effect on the purchase price and the parties' subsequent conduct, including the years long delay on closing—all factual, evidentiary issues which were raised at the hearing on the motion to enforce.

**{¶20}** Wehr testified that he and/or his LLC had rented Catherine's property for close to forty years. When Catherine contacted Wehr in March of 2011 to inform him she was selling, Wehr requested an opportunity to purchase the property. Wehr began discussions regarding the purchase, first with Catherine and subsequently with her son, James. James gave Wehr a copy of the existing 2007 oil and gas lease for the property. Wehr testified that the two discussed that the lease was set to expire in May of 2012 and the amounts other properties in the area were receiving from oil and gas lease negotiations, including the fact that landowners were at that time receiving $2,000 per acre in signing bonuses. (Tr., p. 17.) Wehr testified that James informed him that if he bought the property, Wehr could negotiate a new oil and gas lease on the property and get part of the purchase price back in bonus revenue. *Id.* Wehr testified that it was based on these early negotiations that he arrived at his offer to purchase of $3,850 per acre. According to Wehr, this reflected a fair market value for the land and include the potential for Wehr to negotiate a new oil and gas lease after the expiration of the existing lease.

**{¶21}** The purchase agreement was signed on April 5, 2011. Wehr promptly contacted Farm Credit to secure financing and the survey was conducted. Wehr paid his one-half portion of the survey cost. At that point, the process broke down. There was an extended period of time when Wehr received little or no response from Catherine or her counsel regarding his entreaties to close on the sale, and that during this period any response contained only vague statements regarding problems with the title. It was only after Wehr had his own title agency perform a full title search did he discover the IRS lien and reverse mortgage encumbrance, neither of which should have presented a bar to closing as the purchase price was far in excess of the total amount of both liens. Counsel for Wehr contacted Catherine's counsel with this information and still received no commitment by Catherine as to closing. At that point, in December of 2011, Wehr filed his breach action seeking specific performance.

**{¶22}** The parties ultimately entered mediation in September of 2012, at which time it was agreed that they would proceed with the real estate transfer pursuant to the terms of the April 5, 2011 contract. At the time of the mediation and proposed settlement, the only party aware that Catherine had entered into extended negotiations with Chesapeake to encumber the property with a new oil and gas lease and had entered such lease were Catherine and her counsel. That new lease had been signed in May of 2012, some six months after Wehr commenced litigation seeking specific performance and four months prior to the mediation. Despite the fact that Wehr was not consulted or included in the lease negotiations in any way,

and had no knowledge of them, James curiously asserted at the hearing that the new lease was entered into to protect Wehr and ensure he obtained a higher royalty rate. That protection did not include, however, sharing the $391,000.00 signing bonus received upon execution of the new lease. Moreover, James continues to claim that the estate is entitled to the original purchase price of the April, 2011 contract as well as the ability to retain the entire signing bonus.

{¶23} At hearing and in the appellate brief, Catherine's estate asserts a number of interesting and, at times, contradictory facts. James, a licensed Pennsylvania attorney, testified that he was unaware that the proceeds of the sale could be used to pay off any liens on the property, such as the tax lien and reverse mortgage. He also testified that he did not recall discussing the expiration of the oil and gas lease to the extent that Wehr indicated. Furthermore, he testified that he hired an attorney to begin oil and gas lease negotiations in January of 2012, just one month after Wehr filed his complaint seeking specific performance on the sale of the property. Moreover, Catherine asserts that the new oil and gas lease was entered into for the benefit of Wehr, to "give him the best possible lease", and yet the fact that they were contemplating, negotiating, and finally executing a new lease was information that Wehr, although allegedly being protected, was not privy to even during mediation discussions and despite multiple attempts by Wehr beginning in June of 2011 to discuss closing on the sale of the property. (Tr., pp. 59-60.) The amount of the bonus monies received by Catherine was not ultimately revealed until the hearing on the motion to enforce the settlement. (Tr., p. 97.) James also

testified that, as power of attorney for his mother, he entered into a new farming lease with Wehr in March of 2012, wherein Wehr voluntarily offered to pay an increased monthly rent to retain the ability to farm the land pending closing of the sale.

**{¶24}** Catherine's estate claims on appeal that Wehr's failure to proceed with the sale once he discovered a new oil and gas lease had been signed and pursuing the signing bonus proceeds are tantamount to purposeful delay and greed on Wehr's part.

**{¶25}** The instant case raises a question of fact: whether in entering into the new oil and gas lease with Chesapeake Catherine violated the terms and conditions of the purchase agreement to which both parties agreed to be bound per the settlement agreement. If there was sufficient evidence to support the trial court's conclusion that Catherine's decision to enter into a new oil and gas lease violated the purchase agreement and, by extension, the settlement agreement, the trial court's decision should be affirmed.

**{¶26}** The settlement agreement reads, in pertinent part:

Unless specifically modified by this Settlement Agreement, all terms and conditions set forth in the Purchase and Sale Agreement of April 5, 2011 shall remain in full force and effect.

The purchase agreement contains a "CONDITIONS OF SALE" provision which reads:

> Miscellaneous conditions of sale:  1. Sale subject to BUYER'S and SELLER'S acceptance and approval of survey of PROPERTY.  (2) The transfer of the PROPERTY shall include the transfer of all mineral rights and all oil and gas rights.

(Tr., Exh. B.)

**{¶27}** The April 5, 2011, purchase agreement also contains a "TITLE" provision which reads:

> BUYER agrees to pay the purchase price upon the presentation to BUYER of a general warranty deed conveying the premises free and clear of any encumbrances except zoning ordinances, easements, restrictions, leases, conditions, rights of way of record and real estate taxes and assessments.

*Id.*

**{¶28}** At the hearing, Wehr testified about the discussions he had with Catherine and James regarding the existing oil and gas lease on the property, the then-current rates of bonus payments being offered to landowners in the area on oil and gas leases, and conversations relative to setting a purchase price.  Wehr was informed that once he purchased the property he would likely be able to recoup much of the purchase price by entering into a new oil and gas lease.  Wehr clearly understood that his purchase of the farmland was to be completed and closed prior to the expiration of the existing lease.

**{¶29}** At issue then, was whether the Petraglias purposefully delayed closing on the sale of the property to obtain a benefit to which they would not have been entitled. Regarding discussions which occurred between the parties during the settlement negotiations, the trial court asked James the following:

> THE COURT: Okay, so what's the motivation to enter into the settlement agreement in November of '12, which is essentially the same as the original contract of April of '11, except for the general release, which doesn't pertain to the original purchase agreement, and the dismissal of the pending lawsuit? Why would you decide to enter into that?
>
> MR. PETRAGLIA: I don't know. I mean we wanted to because we wanted to settle the case. We wanted to close. I mean that's --
>
> THE COURT: All right. Was the fact that you had already re-leased the property and received the signing bonus, was that -- since you had made that money was that additional motivation now to finally go forward and close the original purchase agreement?
>
> MR. PETRAGLIA: Well, it was a portion of it, yes.

(Tr., pp. 89-90.)

**{¶30}** Later at the hearing, the trial court questioned James on whether he felt he could continue to encumber the property with additional leases, of record or not, prior to the final closing:

THE COURT: You take the position, evidently, that after you signed the original purchase agreement you were still free to enter into lease agreements with regard to this property?

MR. PETRAGLIA: Yes.

THE COURT: Is that fair?

MR. PETRAGLIA: Yes.

THE COURT: And whatever lease agreements you entered into after the signing of that, Mr. Wehr, upon the closing of that, he'd be stuck with those agreements or he would have to abide by those agreements; is that right?

MR. PETRAGLIA: Yes.

THE COURT: So if you had sold timber off the property and received money for that --

MR. PETRAGLIA: It was still our property, yes.

THE COURT: Okay. If you had decided to enter into a two or three year lease with a trucking company that wanted to store construction equipment on a portion of the farm that he was going to buy he would have been stuck with that as well?

MR. PETRAGLIA: Well, the agreement specifically states leases.

THE COURT: Right. Which leases? Leases that have to be of record?

MR. PETRAGLIA: It doesn't say leases of record, Your Honor.

THE COURT: It just says leases?

MR. PETRAGLIA: Yes.

THE COURT: So how was he to discover about any other leases that you may have entered into that were not of record?

MR. PETRAGLIA: Ask.

THE COURT: All right.

MR. PETRAGLIA: Ask at the mediation or ask us, we would have told him.

THE COURT: So he has to rely upon you to tell him if there are any other encumbrances; is that right?

MR. PETRAGLIA: Yes.

THE COURT: So you take the position that the only things of -- the only things that had to be of record were rights of way; is that right?

MR. PETRAGLIA: Zoning ordinances, easement restrictions, leases conditions, rights of way of record and real estate taxes and assessments.

THE COURT: I heard what your lawyer said, but aren't all those things, do they have to be of record before he has to live with them or can they just be something that you entered into informally and was never recorded?

MR. PETRAGLIA: I would say it would have to be of record.

THE COURT: All those things?

MR. PETRAGLIA: Yes.

THE COURT: Okay. Because that's public notice that all those things exist?

MR. PETRAGLIA: Yeah. I just -- I believe it's not our responsibility to go down and, you know, whatever is filed there and then do the work for them and turn it over. I mean that's up to them to do that.

* * *

THE COURT: And at that time there was a lease, I guess we're calling it the old lease?

MR. PETRAGLIA: Yes.

THE COURT: The old leases of record. But, as you indicated, it was going to exist for a while?

MR. PETRAGLIA: Yes.

THE COURT: But it looked like it was going to run out in about a year?

MR. PETRAGLIA: Yes.

THE COURT: Okay. Now, so -- but you're saying to me that that doesn't stop you from -- because there was a lease then you felt that you had the right to substitute a new lease for that?

MR. PETRAGLIA: Correct.

THE COURT: Is that right?

MR. PETRAGLIA: Yes.

THE COURT: Okay, why do you think that?

MR. PETRAGLIA: Because he bought the property subject to a lease.

THE COURT: Okay, but --

MR. PETRAGLIA: It's not changing it at all.

(Tr., pp. 90-95.)

{¶31} Ultimately, the trial court was not persuaded by James' assertions that entering the new lease and keeping the accompanying bonus payment was permissible under the terms of the settlement:

The evidence is clear that when the Purchase Agreement of April 5, 2011 was negotiated, the parties were well aware that an existing oil and gas lease on the property dated May 24, 2007 would be expiring in

May of 2012, thus, giving Wehr the opportunity to negotiate a new lease. * * * Had this transaction closed within a reasonable time, Wehr would have owned the property for almost a year before the lease would have expired. He could have negotiated the lease to be in conformity with his farming plan as well as all the financial benefits. If Wehr entered into the same contract, the signing bonus of $391,000 would have been his. The evidence supports this Court's conclusion that the opportunity for Wehr to lease the acreage was a factor in setting the per acre price in the contract.

(10/2/13 J.E., pp. 3-4.)

**{¶32}** The trial court further concluded:

[I]t was Petraglia's purpose to delay the closing until the expiration of the 2007 lease in late May of 2012 so that she could pocket the signing bonus, walk away with a windfall, and defeat Wehr's rights to that money. The Defendant's agreement at mediation to carry out the terms of the original contract without disclosing the new lease and signing bonus to Wehr, underscore her purposeful deception in balking at the setting of a closing date on the April 2011 contract. It had to be the Defendant's fervent hope that somehow the fact of the new lease from Petraglia to Chesapeake, or least [sic] the signing bonus, would not come to Wehr's attention at all or at least not until after the sale had long been concluded.

(10/2/13 J.E., p. 4.)

**{¶33}** The colloquy with the trial court demonstrates not only the Petraglias' cavalier attitude toward the contractual terms and conditions of the original purchase agreement but also toward the settlement agreement itself.  Supplanting an original oil and gas lease, set to expire on its own terms in approximately a year, with a second, very different lease with a different company, different royalty rates and, most notably, with an accompanying hidden signing bonus, flies in the face of the basic tenets of contract law.  As noted, in an enforceable contract, the parties must have a meeting of the minds as to the essential terms of that contract.  *Mack v. Polson Rubber Co.,* 14 Ohio St.3d 34, 36, 470 N.E.2d 902 (1984).  This mutual assent prohibits one party from unilaterally modifying the terms of the contract and from withholding material terms while the other party remains in the dark, operating under the original contract with all its terms and conditions.

**{¶34}** Throughout the proceedings below as well as in the brief to this Court, Catherine asserts that the new oil and gas lease with Chesapeake was simply an extension of the existing oil and gas lease.  Moreover, Catherine contends Wehr was aware that an oil and gas lease existed on the property when he entered into the purchase agreement.  The trial court was clearly not persuaded by this assertion and concluded, based upon sufficient evidence presented at hearing, the terms of the purchase agreement did not contemplate or permit James or Catherine to willfully delay closing of the sale only to obtain the benefit of entering into a new oil and gas lease.  The trial court determined after weighing the evidence that Wehr would have

negotiated his own oil and gas lease and the signing bonus at issue would have gone to Wehr had closing taken place as anticipated in the purchase agreement. The court determined that to allow Catherine and her estate to retain the entire signing bonus as well as the farm's purchase price would lead to an inequitable and unanticipated result. Moreover, the court determined "the opportunity for Wehr to lease the acreage was a factor in setting the per acre price in the contract." (10/2/13 J.E., p. 4.) Accordingly, Catherine's first assignment of error is without merit and is overruled.

## ASSIGNMENT OF ERROR NO. 2

THE TRIAL COURT ERRED IN DENYING MS. PETRAGLIA'S MOTION TO ENFORCE THE SETTLEMENT AGREEMENT AND FOR COMPENSATORY DAMAGES.

**{¶35}** In the second assignment of error, Catherine argues it was Wehr's conduct which caused a delay in closing in December of 2012 and as a result she incurred significant expenses. Catherine enumerated multiple costs incurred as a result of Wehr's alleged delay. Specifically, $2,200 in attorney fees to the law firm that was required to act as an intermediary to close the real estate transaction as it was part of a Section 1031 exchange; $19,000 in deposits to a building contractor to prepare her new home upon her exit from the property; monthly payments to the same contractor totaling $12,000 to ensure work was done on her new home once the closing on the property occurred. Lastly, Catherine contends she is entitled to attorney fees related to the enforcement of the settlement agreement.

**{¶36}** It is well settled that "a prevailing party in a civil action may not recover attorney fees as a part of the costs of litigation." *Wilborn v. Bank One Corp.*, 121 Ohio St.3d 546, 548, 2008-Ohio-306, 906 N.E.2d 396, at ¶7. However, attorney fees may be allowed as compensatory damages when they are incurred as a result of a breach of a settlement agreement. *Brown v. Spitzer Chevrolet Co.,* 5th Dist. No. 2012 CA 00105, 2012-Ohio-5623, ¶20.

**{¶37}** In its judgment entry, the trial court concluded Catherine's allegation that Wehr breached the settlement agreement and the related claims for compensatory damages was not well taken. As noted above, the trial court, as trier of fact, concluded the delay in closing was caused purposely by Catherine to obtain the benefit of a new oil and gas lease and the related signing bonus. As the trial court did not err in granting Wehr's motion to enforce the settlement agreement, Catherine was not entitled to an award of compensatory damages. Catherine's second assignment of error is without merit and is overruled.

CROSS-ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN DENYING WEHR PROPERTIES [SIC]

MOTION FOR PAYMENT OF ATTORNEY FEES.

**{¶38}** In his cross-assignment of error, Wehr contends the trial court erred in not awarding attorney fees incurred as a result of seeking enforcement of the settlement agreement. As earlier noted, while recovery of attorney fees is generally not permitted in a civil action, courts in Ohio have recognized an exception for attorney fees arising from enforcement of a settlement agreement. *Brown,* at ¶20.

The Tenth Appellate District has recognized "a distinction between cases in which attorney fees are awarded as costs and those in which the fees are awarded as part of the aggrieved party's damages." *Tejeda-Hercules v. State Auto Ins. Co.,* 10th Dist. No. 08AP-150, 2008-Ohio-5066, ¶9. Thus, attorney fees may be awarded where it can be established they were the result of the offending party's breach of the settlement agreement and sought as compensatory damages and not merely as costs of the action. *Id.* The Eighth District has recognized an award of attorney fees as compensatory damages as a result of enforcement of a settlement agreement. *Berry v. Lupica,* 196 Ohio App.3d 687, 2011-Ohio-5381, 965 N.E.2d 318, ¶19.

**{¶39}** Weir did not submit a transcript of the hearing on attorney fees or otherwise file either a statement of the evidence or proceedings pursuant to App.R. 9(C). On this basis with the limited record before us, we cannot conclude that the trial court abused its discretion in the matter. *Ciura v. Carletti*, 7th Dist. No. 02-CA-212, 2003-Ohio-4460, ¶11.

**{¶40}** Regarding Wehr's motion for attorney fees, in a January 9, 2014, judgment entry, the trial court concluded:

The Court finds Defendant Petraglia's Post-Hearing Brief to be both accurate and well-reasoned.

For the reasons set forth therein, the Court hereby **denies** the Plaintiff's Motion seeking attorney fees." (Emphasis sic.)

(1/9/14 J.E., p. 1.)

**{¶41}** In Catherine's post-hearing brief opposing these fees, she asserted that attorney fees should not be awarded to Wehr because his documentation in support was inadequate. Specifically, the documents failed to be "of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." (11/15/13 Post-Hearing Brf., p. 5 citing *Imwalle v. Reliance Med. Prods.,* 515 F.3d 531, 553 (6th Cir.2008).

**{¶42}** Wehr's counsel submitted an affidavit as well as two invoices along with copies of checks for payment. The statements are dated August 14, 2013, and October 15, 2013, respectively. The two invoices for legal work date from November 1, 2012 through September 4, 2013. Wehr's motion to enforce the settlement agreement was filed December 14, 2012. Thus, the dates in the invoices are presumably associated with the relevant time period. However, reviewing both invoices, billing line items lack the requisite detail to ascertain what legal work was involved. For example, approximately fifty-one entries list only "Work on file," while several others contain only a few words, such as "draft correspondence" and "hearing preparation," with little or no indication as to what matter was being addressed or what was being researched. Such vague and cryptic entries are insufficient to support an award of attorney fees as compensatory damages contemplated by the caselaw. *See Imwalle, supra; see also Shanker v. Columbus Warehouse Ltd. Partnership*, 10th Dist. No. 99AP-772, 2000 WL 726786 (Jun. 6, 2000.) (noting that attorney fees can be awarded as compensatory damages flowing from a breach of a

settlement agreement.)  Therefore, the trial court did not err in denying Wehr's motion for attorney fees as compensatory damages.  Wehr's cross-assignment of error is without merit and is overruled.

## Conclusion

**{¶43}** Catherine presents two assignments of error on appeal.  In the first assignment, she incorrectly asserts the trial court erred in granting Wehr's motion to enforce the settlement agreement.  The record supports the trial court's findings regarding Catherine's delay so that she could improperly encumber the property with a new oil and gas lease.  In the second assignment of error, Catherine contends the trial court erred in failing to grant her motion to enforce the settlement agreement and award her compensatory attorney fees.  However, as the trial court did not err in concluding the original delay in closing was improperly caused by Catherine, the trial court did not err in concluding attorney fees to Catherine were not warranted.  On cross-appeal, Wehr asserts the trial court erred in failing to award him compensatory attorney fees relative to the motion to enforce settlement agreement.  A review of the statements and affidavits of the attorney fees in question reveal they lack the sufficiency and detail required for the court to award such fees.  Therefore, based on the foregoing, Catherine's assignments of error are overruled.  Wehr's cross-assignment of error is also overruled.  The judgment of the trial court is hereby affirmed in full.

Donofrio, P.J., concurs.

DeGenaro, J., concurs in part and dissents in part; see concurring in part and dissenting in part opinion.

DeGenaro, J., concurring in part and dissenting in part.

**{¶44}** While I join the majority in most of its analysis, I respectfully dissent with respect to attorney fees. I am mindful that Wehr failed to file a transcript of the attorney fee hearing, which constrains our review. However, the record before us demonstrates that Wehr presented evidence with sufficient detail to support an award of attorney fees in some amount; it was an abuse of discretion for the trial court to summarily reject an award.

**{¶45}** Catherine's challenge to Wehr's request for attorney fees was two-fold. First, she asserted that because she did not breach the settlement agreement, Wehr was not entitled to attorney fees at all; and second, she claimed the hours billed were excessive and the statements lacked sufficient detail. The trial court denied Wehr's motion for attorney fees, merely stating: "The Court finds Defendant Petraglia's Post-Hearing Brief to be both accurate and well-reasoned. For the reasons set forth therein, the Court hereby **denies** the Plaintiff's Motion seeking attorney fees." (emphasis in original) The trial court's rationale is erroneous and therefore an abuse of discretion for two reasons.

**{¶46}** First, the trial court's October 2, 2013 judgment granting Wehr's motion to enforce the settlement agreement rests upon a conclusion that Catherine breached the settlement agreement by, as the trial court found, her "purposeful deception" in order to "pocket the signing bonus, walk away with a windfall, and defeat Wehr's rights to that money." As recognized by the majority, attorney fees incurred in order to enforce a settlement agreement are in the nature of compensatory damages rather than the costs of litigation. Majority, ¶ 39. Accordingly, as a matter of law, Wehr was entitled to attorney fees, and the trial court's determination otherwise was erroneous.

**{¶47}** Second, and regardless of the lack of a transcript, as noted in Wehr's November 27, 2013 post-hearing motion, Wehr's expert testified that the hourly rate charged and amount of hours spent on the matter were reasonable. The record further demonstrates that Catherine requested three continuances of the hearing.

The first occurred two weeks before the original date, the second, two days before the first rescheduled date, and finally, the third was requested the day of the second rescheduled date. Although Catherine's post-hearing brief filed with the trial court indicates that two continuances were due to her hospitalization, regardless of the reason, counsel for Wehr still had to be fully prepared to go forward each time. Thus, the argument of repetitive preparation is not valid.

**{¶48}** Finally, contrary to the assertion of the majority, there was detailed evidence before the trial court with respect to the nature and amount of attorney fees incurred by Wehr in the billing invoices submitted for the trial court's consideration via affidavit. While the entries merely stating "work on file" are clearly insufficient, others offering more detail, should have been considered. Several examples of the latter include: 1) telephone conference with Mr. Heck re: Petraglia title issues; 2) draft enforcement motion; 3) Research re: compensatory damages. Review enforcement motion; 4) Review pleadings. Telephone conference with Judge Pike's bailiff; 5) Prepare for hearing. Preparation and attend scheduled hearing; 6) Review documents from Attorney Murphy. Review Court Order. Telephone conference with Mr. Wehr; 7) Review testimony sheets. Research 'benefit of the bargain' cases. Conference with Mr. Wehr. Telephone conference with Attorney Mots. Conference with Judge Pike's Bailiff.

**{¶49}** Catherine breached the settlement agreement, and as a result, Wehr was entitled to an award of attorney fees as a matter of law, and the trial court abused its discretion by failing to make an award in some amount. Despite the lack of a hearing transcript, the limited record before us reveals that there was expert testimony and moreover, the record demonstrates that there were a number of entries with sufficient detail from which to base an attorney fee award, which the trial court should have considered and did not. Accordingly, the trial court's decision regarding attorney fees should be reversed and the matter remanded.