# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
CARROLL COUNTY

DR. JEFFREY BORY ET AL.,

Plaintiffs-Appellees/Cross-Appellants,

v.

MARTIN ROUDEBUSH ET AL.,

Defendants-Appellants/Cross-Appellees.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 24 CA 0978

---

Civil Appeal from the
Court of Common Pleas of Carroll County, Ohio
Case Nos. 2015CVH28333, 2023CVC30331

**BEFORE:**
Katelyn Dickey, Cheryl L. Waite, Carol Ann Robb, Judges.

---

**JUDGMENT:**
Reversed, Vacated and Remanded.

---

*Atty. David M. Smith, Atty. Matthew R. Janack* and *Atty. Amily A. Imbrogno,* Meyers Roman Friedberg & Lewis, for Plaintiffs-Appellees/ Cross-Appellants and

*Atty. Sandra K. Cheshire,* Cheshire Law Office, LLC, for Defendants-Appellants/ Cross-Appellees.

Dated:  April 9, 2025

**DICKEY, J.**

**{¶1}** Appellants/Cross-Appellees, Martin Roudebush, both individually ("Martin") and in his role as Third Successor Trustee of the Jay F. Roudebush and Beverly J. Roudebush Trust ("Trust"), and Beverly Roudebush ("Beverly") (collectively "Roudebushes"), and Appellees/Cross-Appellants, Jeffrey Bory ("Bory") and Germaine Lawless (collectively "Borys") appeal the August 26, 2024 judgment entry of the Carroll County Court of Common Pleas resolving the parties' cross-motions to enforce settlement agreement in the Borys' favor, following the global settlement of two cases (2015CVH28333 and 2023CVC30331) on the first day of a bench trial on the Roudebushes' adverse possession counterclaim in the 2015 case.

**{¶2}** At issue in the Roudebushes' appeal is the western boundary of the property subject to the terms of the settlement agreement, which transferred ownership of what the Roudebushes referred to as the "disputed triangle" from Bory to the Trust. In the judgment entry on appeal, the trial court identified the property as the 0.128-acre triangle west of the quarter section line depicted on a boundary survey prepared by Hammontree and Associates ("Hammontree survey"). The Hammontree survey was offered by the Roudebushes, without objection, at the hearing where the parties placed the material terms of the settlement on the record ("May 13th hearing"). The Roudebushes argue the western border of the property subject to the settlement agreement is the eastern border of the Bory driveway, which adds 0.010-acre to 0.128-acre triangle identified by the trial court.

**{¶3}** Although the trial court adopted the Borys' argument regarding the western border of the property subject to the settlement agreement, they appeal the judgment entry to the extent that it: (1) purports to supplant the written settlement agreement which was to be drafted by counsel for the Roudebushes pursuant to the parties' oral agreement at the May 13th hearing; (2) requires the Borys' first payment within thirty days of May 13, 2024; and (3) denies their motion for attorney fees.

{¶4} Having reviewed the record, we find the parties did not have a "meeting of the minds" with respect to a material term of settlement. Accordingly, the judgment entry on appeal is reversed and vacated and this matter is remanded for trial.

## FACTS AND PROCEDURAL HISTORY

{¶5} The parties are owners of adjoining properties located on State Route 43 in Carroll County. Jay Roudebush, Beverly's father, acquired the Roudebush property in 1973, then transferred it to Beverly, who ultimately transferred the property to the Trust. Beverly has resided on the property since it was acquired by Jay in 1973. Martin has resided on the property since 2009.

{¶6} Bory acquired the property west of the Trust property in 2002. The metes and bounds descriptions within the applicable deeds set the western boundary of the Trust property at the quarter section line on the Hammontree survey.

{¶7} In 2015, the Borys filed a declaratory judgment action against the Trust asserting the gravel driveway used by the Roudebushes was located on the Bory property. The Borys also asserted claims for trespass against Martin and Beverly, and nuisance and assault against Martin. The Trust filed counterclaims for adverse possession, declaratory judgment, and to quiet title.

{¶8} The Borys voluntarily dismissed their nuisance and assault claims against Martin without prejudice on February 28, 2017. Their remaining claims and the Trust's adverse possession claim were the subject of cross-motions for summary judgment.

{¶9} On October 31, 2017, the trial court sustained the Borys' motion for summary judgment in part, with respect to their claims predicated upon the metes and bounds of their property, and denied it in part, with respect to the Borys' trespass claim. The trial court denied the Trust's cross-motion for summary judgment on its adverse possession claim. The Borys' trespass claim and the Trust's adverse possession counterclaim were set for trial. In the interim, the Borys and the previous trustee settled the case.

{¶10} In the years that followed, Martin and Beverly, in their role as beneficiaries of the Trust, filed three successful appeals challenging the probate court's approval of three separate settlement agreements. Previous settlement agreements required the Trust to move the Roudebush driveway at the Trust's expense. After the Roudebushes' first appeal from the probate court, the Borys dismissed their trespass claim against Martin and Beverly without prejudice on February 14, 2020.

{¶11} On August 23, 2023, roughly two months after the Roudebushes' third successful appeal from the probate court, the Roudebushes filed a civil action against the Borys asserting claims for trespass, nuisance, negligence, making false alarms (police reports), disorderly conduct, criminal trespass, breaking and entering, and intentional infliction of emotional distress. The 2023 complaint specifically referenced the 2015 action, reading that both the 2015 and 2023 actions "involve[d] approximately one-quarter of an acre which is on the common border of the two properties, referred to herein as the "Disputed Triangle." (2023 Complt., ¶ 14.) A footnote defines the phrase "Disputed Triangle" for the purposes of the 2023 litigation as "the real estate which [the Roudebushes] claim by adverse possession" in the 2015 action.

{¶12} The Borys filed an answer and counterclaim, in which they described the Roudebushes' counterclaim in the 2015 action as "attempting to seize a driveway that is located on the Bory Property," which the Borys refer to as the "Bory Triangle." (Counterclaim at ¶ 12.) The Borys' counterclaims include menacing by stalking, nuisance, assault, engaging in frivolous conduct in violation of R.C. 2323.51, vexatious litigation, and intentional infliction of emotional distress.

{¶13} Pursuant to a judgment entry filed on December 22, 2023, the Trust retained Tim Uzl of Hammontree and Associates to conduct a survey of the disputed property. According to the Roudebushes, Bory interfered with the survey, which was conducted on January 24, 2024. Uzl surveyed the area to which he had access and agreed to return and place rebar after the trial court determined the property boundary. The survey Uzl produced is the Hammontree survey, which depicts the 0.128-acre triangle to the west of

the quarter section line, which the trial court concluded is the property subject to the settlement agreement. Notably, the 0.128 triangle contains within it a 0.090-acre triangle.

**{¶14}** In a January 4, 2024 judgment entry, the trial court sustained the Roudebushes' motion to stay the 2023 case, with the agreement of the Borys, pending the outcome of the bench trial in the 2015 case, which was scheduled for May 13, 2024. In the Roudebushes' trial brief, they assert the western boundary of the property obtained by adverse possession is "the border of the 1973-2002 location of [the Borys'] driveway." (5/6/24 Roudebush Tr. Brf., p. 12.) The Roudebushes allege the Borys widened the original driveway, extending its eastern border by two to three feet.

**{¶15}** On May 13, 2024, the first day of the bench trial, the parties indicated they reached a global settlement of both cases. The trial court conducted the May 13th hearing in order to place the material terms of the settlement on the record. Attorney Thomas Connick, counsel for the Roudebushes, provided the following summary:

> [The Trust is] awarded all of this disputed property in the disputed triangle. Uh…I'm going to be uh…showing here, for purposes of settlement, Exhibit uh…One [Hammontree survey], that has the, and I'm just going to write Exhibit One on this, 'cuz it's been uh…it's been identified as a different exhibit for trial. But for the purposes of settlement, I'm going to put Exhibit One and…uh…this is the page of the Engineer Planner Surveyor, re, re, regarding the property, that the disputed triangle involves. And then there's a photographic piece here…uh…which I'll, uh…mark as Exhibit Two [a photograph of the Bory driveway with dashed line and "X" on the eastern corner of the cement apron at the bottom of the driveway]. And what's important here is Exhibit Two will show, we're being awarded all of the property uh…up to the dashed line in this exhibit and then just to the right of the dash-line in the Exhibit, which is on the Bory uh…[concrete] driveway apron. I put an "X" with a circle and that's part of the disputed property that is being awarded to the Roudebush[e]s, but the Roudebush[e]s are awarding an easement uh…to the Borys to use that portion of the apron for

when they come in and come out. That way they don't have to cut the concrete or anything like that.

So, that's, that's issue number one. Um…and if that's not clear, then please ask any questions and we'll make it clear. The second part of the settlement is uh…the [Borys] will pay fifty-five thousand dollars uh…to the, to the Roudebush[e]s pursuant to the following terms. Five thousand dollars down, at the time uh…the settlement agreement is executed, which I'll get to in a second. Thereafter, twenty-three monthly payments uh…of two thousand, one hundred, seventy-three dollars and ninety cents, will come out of uh. . .Bory's ACA, ACH account and will be wired into my IOLTA account and I will provide [opposing counsel] um…my IOLTA account, my uh…uh…number uh…and then I'll issue the check to the Roudebush[e]s every month out of my IOLTA account. Uh…in addition, uh…to that, uh…the Borys have agreed to uh…sign a cognovit note, in the amount of fifty-five thousand dollars uh…less any um…received payments to-date. Uh…I will also prepare that cognovit uh…note with uh…[opposing counsel's] approval. Uh…we will also enter into a mutual protective order. Um…so, hopefully uh…everyone uh…uh…doesn't get into anybody else's way with the exception that uh…if somebody is on the other person's property, they may take pictures and of course, follow the law and call police, etcetera. Uh…there's no confidentiality agreement to this, Your Honor. We don't think that would make sense, in this case. Um…the settlement is subject to uh … probate approval. Um…with, I, what I, what I believe to be a visiting probate judge. Uh…the settlement agreement uh…which I'm going to take the first stab at drafting. Uh…I will have over to [opposing counsel] within fourteen days of today's date. Uh…and then it, it is to be executed uh…and first payment of five thousand dollars within thirty days of today's date. Uh…[Opposing Counsel] have I covered everything?

(5/13/24 Hearing Tr., p. 4-6.)

{¶16} Attorney David Smith, counsel for the Borys, responded, "I believe that, I believe that's correct. Hold on." Attorney Connick interrupted, "David, real quick, I don't think there's a problem but … since we're doing the easement and everything, we should get another survey just to make sure it's all on plead. Fair? [sic]" (*Id.* at p. 6.) Sandra Cheshire, co-counsel for the Roudebushes, explained Uzl agreed to return "because of the interference." Attorney Smith inquired, "[b]ut its not going to include that extra two feet into the driveway, right?" Attorney Cheshire responded, "No, it's going to be the edge of the driveway." (*Id.* at p. 7.)

{¶17} The trial court asked, "[w]hile you guys talking [sic] about a question I had, so…that, this just popped into my head, you know, is, is there a need for a new survey with these lines, whose paying for it?" Attorney Connick explained, "I think we just worked that out. Um…[Uzl] has agreed to come back and resurvey it. Uh…based on our agreement. Uh…we will bear the expense for that. It'll be put on a plat. So, it'll be of record." (*Id.*) The trial court inquired, "[Borys], do you have any issue with that? What he just said?" Attorney Smith responded, "No, that's fine." (*Id.*)

{¶18} While reviewing the exhibits, the trial court asked, "[s]o this dotted line … on Exhibit Two, is the, the line you're talking about. And to the right of this line …" Attorney Connick responds, "[s]o, to the, to the right of that line is all of the Roudebush[e]s' property that is in disputed [sic] property. . . . They get all of that. . . . To the left of the line, is Bory property and where I have it circled with the "X" in it . . . [i]s the easement that we're allowing them to use the driveway." (*Id.* at p. 8-9.)

{¶19} Both Martin and Bory attended the May 13, 2024 hearing. Both parties agreed under oath to the terms of settlement as described on the record. Despite the fact that both parties to the settlement agreed to its terms, the Hammontree survey does not identify the property subject to the settlement agreement, and the boundaries of the property cannot be gleaned from the discussion at the May 13th hearing. Of equal import, neither party to this appeal contends the western border of the property is not a material term of the settlement.

Case No. 24 CA 0978

{¶20} When Uzl arrived to conduct the survey on May 31, 2024 ("second survey"), his efforts to survey the property subject to the settlement agreement revealed the dispute between the parties regarding the western boundary of the property. Counsel for the Roudebushes instructed Uzl to survey all of the property west of the quarter section line to the eastern border of the Borys' gravel driveway, however, counsel for the Borys refused to permit Uzl to survey the property west of the 0.128 line on the Hammontree survey.

{¶21} On July 26, 2024, roughly two and a half months after the settlement was entered on the record, the Borys filed a motion to enforce the settlement agreement and for attorney fees expended in the pursuit of the motion to enforce. On August 5, 2024, the Roudebushes filed a cross-motion to enforce the settlement agreement and for attorney fees related to the cross-motion. The brief filed in support also served as the Roudebushes' opposition to the Borys' motion. On August 12, 2024, the Borys filed their opposition brief to the Roudebushes' cross-motion. On August 19, 2024, the Roudebushes filed their reply. Both parties agreed that no easement was necessary. According to the Roudebushes, the second survey revealed the apron of the Borys' driveway was in the right-of-way of State Route 43.

{¶22} A telephone pretrial was conducted on August 21, 2024. Argument but no evidence was offered in support of the cross-motions. During the pretrial, counsel for the Borys argued the western boundary of the property subject to the settlement agreement was depicted on the Hammontree survey as the 0.128-acre line, (0.090 + 0.0380 = 0.128 acres), leaving to the Borys the 0.010 acres of property east of the Bory driveway to the 0.128-acre line. Counsel for the Roudebushes argued the property subject to the settlement agreement was the 0.138-acre triangle, which extends the western boundary of the property subject to the settlement agreement to the eastern edge of the Borys' current driveway (0.010 + 0.0380 + 0.090 = 0.138 acres).

{¶23} The trial court initiated the discussion at the telephone pretrial, observing the property subject to the settlement agreement is the 0.128-acre triangle, versus what he termed the "actual triangle" within, which is 0.090 acres. The trial court reasoned there

would be no need for an easement if the property subject to the settlement agreement was the 0.090-acre portion because the Borys' driveway apron was clearly not located within the 0.090-acre portion on the Hammontree survey.

**{¶24}** Counsel for the Borys explained the reason the photograph with the dashed line and the "X" was offered was to be certain that if the second survey revealed the Borys' driveway apron was within the 0.128-acre triangle, the Borys would not have to tear out the concrete apron. Counsel for the Borys explained:

> The only reason the new survey was ever contemplated was to determine the area of the easement for the plat to be finished, not to expand [the property subject to the settlement agreement] from .128 acres to .138 acres, which is what [the Roudebushes' counsel] is trying to do here. . . . What my clients never would've agreed to, some unknown number that [counsel for the Roudebushes] was going to determine at a later date, at their property.

(8/21/24 Hrg., p. 6.)

**{¶25}** The Roudebushes' counsel countered the 0.128 line is demarcated on the Hammontree survey and would have provided a clear reference to the purported western border of the property subject to the settlement agreement at the hearing. However, neither counsel for the Borys nor counsel for the Roudebushes referred to the 0.128 line during the May 13th hearing, because the line was not the agreed-upon western boundary of the property subject to the settlement agreement.

**{¶26}** The Roudebushes' counsel further argued counsel for the Borys would have no reason to confirm on the record at the May 13th hearing that the Trust was abandoning its claim to the eastern two feet of the Bory driveway, if the western border of the property subject to the settlement agreement was the 0.128 line. When the Borys' counsel inquired about the second survey at the May 13th hearing, he asked "it's not going to include that extra two feet of driveway, right?" The Roudebushes' counsel responded, "No, it's going to be the edge of the driveway." (5/13/24 Hrg., p. 7.)

{¶27} Next, the Roudebushes' counsel argued no easement would have been required because the Borys' driveway apron does not encroach on the 0.128 line on the Hammontree survey. Counsel argued, "we would've had a survey and a legal description. There would have been no need, second survey.  And [the photograph with the dashed line and the "X"] shows the line goes through the apron continuing through the edge of the driveway.  That's what we agreed to." (8/21/24 Hrg., p. 8-9.)

{¶28} Finally, the Roudebushes' counsel argued the easement was an absolute requirement at the May 13th hearing, rather than a "proposed" easement as characterized by the Borys at the telephonic pretrial.  At the telephonic pretrial, Attorney Cheshire explained the discussion at the May 13th hearing as follows, "[w]e are going to the edge of the driveway and that cuts off the apron. The Trust will plan an easement for the appropriate apron east of the edge of the driveway." (*Id.*)

{¶29} Counsel for the Borys stated he and counsel for the Roudebushes negotiated the settlement in the hallway outside of the courtroom.  Counsel for the Borys further stated the initial demand from Attorney Cheshire included the eastern two feet of the Bory driveway.  The demand reflected a comment made by Martin to Bory during the proceedings that Bory would have to tear out the concrete apron. According to counsel for the Borys at the telephonic pretrial, he and Attorney Connick, explained to Attorney Cheshire, "no, this is what's being agreed to." (*Id.*)

{¶30} In a heated exchange, Attorney Connick represented neither he nor Attorney Cheshire had agreed the 0.128 line would be the western boundary of the property subject to the settlement agreement.  Counsel for the Borys responded, "[t]hat's all we talked about."  (*Id.*, p. 10.)  He continued, "[y]ou know that we were negotiating between the .09[0] and [0].128.  That's what that whole negotiation [ ] was that morning." (*Id.*, p. 11.)

{¶31} At the telephonic pretrial, the trial court inquired, "[m]y only question still hasn't been answered. It was re, regarding this line on the very left.  Not the, the perfect triangle.  The, the left of that, that line [the 0.128 line]. Does that cut the apron off?" (*Id.*, p. 13.)  Counsel for the Borys responded, "[i]t still doesn't…it still doesn't ever under the

[second survey]. [The second survey] still goes to the corner there. So, there is still no need for, for an easement." (*Id.*)

**{¶32}** Counsel for the Roudebushes explained:

When [Uzl] came out on May 31st, because of [counsel for the Borys], [Uzl] would only put stakes on the 0.128 line. The 0[.]128 line does not include any part of the apron and is anywhere from um ... a few inches to two feet from the edge of the driveway. . . [T]he reason [Uzl] did not go into that apron, the reason and the easement is not necessary, is because that expanded concrete [apron] is actually on the right-of-way for Route 43.

(*Id.*, p. 13-14.)

**{¶33}** During the telephonic pretrial, the trial court opined:

This line is what the Order is. It's this left most line [the 0.128 portion]. Whether or not that cuts off the apron, I can't tell from Exhibit One. If it does cut off the apron, then that's why you need [the photograph of the Bory driveway with the dashed line and the "X"] and why you need an, an easement. But tho…the…the agreement is this left most line. Just to the right of the Bory driveway. That's what the agreement is. And so that's what the Order will be . . . You, you agreed to it on the record. The Order will be what the record says. My understanding of the record is that it is this left most line, is what has been awarded to the Roudebush[e]s.

(*Id.*, p. 15.)

**{¶34}** Counsel for the Roudebushes asked, "[a]re you saying it's the left most line that shows the 0.128? The trial court responded, "I have no idea what acreage that is. I can't tell from this map." (*Id.*, p. 15-16.) Referring to the Hammontree survey, the trial court continued:

You've got this triangle. Now, to me there are really two triangles here. There's the right triangle and the left triangle. The left triangle isn't a perfect triangle. Those two combined is what was agreed to. Now, that's just to the right of the driveway. It comes down and reaches the road. Whether or not that cuts off the apron, I don't know. But that is my understanding at the day of the settlement and that, and nothing is said here today has changed my mind as to what the settlement actually was.

(*Id.*, p. 16.) The telephonic conference was then concluded.

**{¶35}** It is important to note that a bench trial was scheduled to commence on May 13, 2024. Insofar as the trial court was the trier of fact, the trial judge was not permitted to participate in settlement negotiations. As a consequence, we presume the information regarding the settlement provided to the trial court was limited to the terms placed on the record at the May 13th hearing.

**{¶36}** The judgment entry on appeal filed on August 26, 2024 reads in relevant part:

The Court approves and adopts the following Agreement as was read onto the record, and agreed upon by both parties:

The following settlement agreement resolved all outstanding issues in cases 15 CVH 28333 and 23 CVC 30331.

[The Borys] shall pay fifty-five thousand dollars ($55,000.000) to [the Roudebushes] with five thousand dollars ($5,000.00) down, within thirty (30) days from May 13, 2024, and an additional twenty-three (23) monthly payments of two thousand, one hundred, seventy-three dollars and ninety cents ($2,173.90) to be wired to [counsel for the Roudebushes'] IOLTA account who will then issue a check to Defendants. . . ;

[The Borys] agreed to sign a cognovit note, with [their counsel's] approval in the amount of fifty-five thousand dollars ($55,000.00), less any received payments to date;

[The Trust] shall receive all of the property in the Exhibit 1 disputed triangle. The Court determines that this triangle includes the western most curved line that runs just to the right of [the Borys' driveway] as shown in Exhibit 1;

[The Trust] shall also receive the property up to and to the right of the dotted line on Exhibit 2. The Court will note that this dotted line extends only to the top of the driveway apron, any property to the north of that dotted line must comply with the land given under the survey in Exhibit 1;

It is anticipated that a new survey may be necessary to create an adequate legal description of the property being given to [the Roudebushes] and for an easement so [the Borys] can continue to use their driveway apron. Therefore, if a survey is necessary then [Uzl] shall conduct a survey at [the Trust's] expense.

The parties will enter into a mutual protective order with all of the parties agreeing not to harass the other party;

The settlement has been verbally agreed to on the record by the parties and is subject to Probate Court approval.

(8/26/24 J.E., p. 2-3.) The judgment entry continues, "[t]his Order shall act as a replacement of the parties' written settlement agreement." (*Id.* at p. 3.)

{¶37} The trial court did not award attorney fees or cost to either party. These timely appeals followed.

Case No. 24 CA 0978

### ROUDEBUSHES' ASSIGNMENT OF ERROR

**THE TRIAL COURT ERRED IN ITS FACTUAL DETERMINATIONS OF THE REAL ESTATE TO BE TRANSFERRED TO [ROUDEBUSHES].**

**{¶38}** We summarized the law in Ohio as it relates to settlement agreements in *Wynn v. Waynesburg Rd LLC*, 2018-Ohio-3858 (7th Dist.), as follows:

Settlement agreements are highly favored as a means for resolving disputes between parties because they serve to prevent or bring to a close additional litigation. *State ex rel. Wright v. Weyandt*, 50 Ohio St.2d 194, 197, 363 N.E.2d 1387 (1977). A settlement agreement is an enforceable contract resolving a legal dispute by preventing or ending litigation. *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502, 660 N.E.2d 431 (1996). "A contract is generally defined as a promise, or a set of promises, actionable upon breach." *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶ 16, quoting *Perlmuter Printing Co. v. Strome, Inc.*, 436 F.Supp. 409, 414 (N.D.Ohio 1976). The trial court has full authority to enforce settlement agreements that have been voluntarily entered into by the parties. *Mack v. Polson Rubber Co.*, 14 Ohio St.3d 34, 36, 470 N.E.2d 902 (1984). In order to be enforceable, a contract must have "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik* at ¶ 16. There also must be a meeting of the minds as to the essential terms of the contract. *Id.*

*Wynn* at ¶ 15.

**{¶39}** " 'The mere fact that parties who have reached a verbal agreement also have agreed to reduce their contract to writing does not prevent the agreement from being a contract if the writing is not made.' " *PNC Mtge. v. Guenther*, 2013-Ohio-3044, ¶ 15 (2d

Dist.), quoting *Union Sav. Bank v. White Family Cos., Inc.*, 2009-Ohio-2075, ¶ 26 (2d Dist.). "Where all of the substantial terms of a contract have been agreed on and there is nothing left for future settlement, the fact alone that it was the understanding that the contract should be formally drawn up and put in writing does not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed." *Charvat v. Oasis Mtge.*, 2003-Ohio-2879, ¶ 13 (10th Dist.), quoting 12 American Jurisprudence, Contracts, Section 25, 522.

{¶40} A settlement agreement is enforceable regardless of whether it has been reduced to writing, where the terms of the agreement can be established by clear and convincing evidence. *Briceland v. Briceland*, 2021-Ohio-3161, ¶ 26 (7th Dist.). Clear and convincing evidence provides a firm belief or conviction as to the facts sought to be established in the mind of the trier of fact. *Cincinnati Bar Assn. v. Massengale*, 58 Ohio St.3d 121, 122 (1991). The terms of an agreement must be reasonably certain and clear to constitute a valid settlement agreement. *Rulli v. Fan Co.*, 79 Ohio St.3d 374, 376 (1997).

{¶41} The Ohio Supreme Court in *Rulli* explained:

"A court cannot enforce a contract unless it can determine what it is. . . . [The parties] must have expressed their intentions in a manner that is capable of being understood. It is not even enough that they had actually agreed, if their expressions, when interpreted in the light of accompanying factors and circumstances, are not such that the court can determine what the terms of that agreement are."

*Rulli*, at 376, quoting 1 Corbin on Contracts, Section 4.1, at 525 (Rev.Ed.1993).

{¶42} Once a settlement offer has been accepted, the settlement agreement is mutually binding. In other words, the settlement agreement cannot be set aside simply because one of the parties later changes its mind. *See, e.g., Turoczy Bonding Co. v. Mitchell*, 2018-Ohio-3173, ¶ 18 (8th Dist.) ("Once there is . . . a meeting of the minds, one

cannot refuse to proceed with settlement due to a mere change of mind."), citing *Mack v. Polson Rubber Co.*, 14 Ohio St.3d 34, 36-37 (1984); *Clark v. Corwin*, 2018-Ohio-1169, ¶ 13 (9th Dist.) (" '[W]hen the parties agree to a settlement offer, [the] agreement cannot be repudiated by either party, and the court has the authority to sign a journal entry reflecting the agreement and to enforce the settlement.' "), quoting *Shetler v. Shetler*, 2001 WL 542318, *2 (9th Dist. May 23, 2001).

**{¶43}** Nonetheless, the Ohio Supreme Court has opined:

> Where parties dispute the meaning or existence of a settlement agreement, a court may not force an agreement upon the parties. To do so would be to deny the parties' right to control the litigation, and to implicitly adopt (or explicitly, as the trial court did here) the interpretation of one party, rather than enter judgment based upon a mutual agreement.

*Rulli*, *supra,* at 377.

**{¶44}** A bifurcated standard of review exists where a party seeks to enforce a settlement agreement. *Wehr v. Petraglia*, 2016-Ohio-3126, ¶ 17 (7th Dist.). Where a question of law is presented, an appellate court must determine whether the trial court applied the correct legal standard and properly construed the law. *Id.*, citing *Continental W. Condominium Unit Owners Assn. v. Howard E. Ferguson, Inc.*, 74 Ohio St.3d 501, 502 (1996). Where a question of fact or evidentiary issue is presented, an appellate court must look to whether sufficient evidence supports the trial court's findings. *Wehr* at ¶ 17, citing *Chirchiglia v. Ohio Bur. of Workers' Comp.*, 138 Ohio App.3d 676, 679 (7th Dist. 2000).

**{¶45}** In the judgment entry following the telephonic pretrial, the trial court made a determination that the 0.128 line on the Hammontree survey was the western border of the property subject to the settlement agreement. However, there is sufficient evidence from the May 13th hearing that supports the conclusion that the Roudebushes believed the negotiated settlement set the western boundary of the disputed property at the eastern border of the Bory driveway.

{¶46}  For instance, the Borys argue counsel for the Roudebushes conceded the western boundary was the 0.128-acre line on the Hammontree survey when Attorney Connick cited the easement as the sole reason for the second survey at the May 13th hearing:

Attorney Connick:  Dave, real quick. I don't think there's a problem but … since we're doing the easement and everything, we should get another survey just to make sure its all on plead. Fair? [sic]

Attorney Smith:  Who's going to (inaudible).

Attorney Cheshire:  Ours, our, our surveyor agreed to come back and do it because of the interference.

Attorney [Smith]:  Okay. So, and so you're paying for it?

Attorney Cheshire:  Yeah.

Attorney [Smith]:  Okay.

Attorney Smith:  But it's not going to include that extra two feet of driveway, right?

Attorney Cheshire:  No, it's going to be the edge of the driveway.

Attorney Smith:  Okay.

The Court:  While you guys talking [sic] about a question I had, so...that, this popped into my head, you know, is, is there a need for a new survey with these lines, whose paying for it...

Attorney Connick:  Ye[s], yes, Your Honor.

The Court:  And that sort of thing.

Attorney [Connick]:   And that's, I think we just worked that out.  Um...[Uzl] has agreed to come back and resurvey it. Uh...based on our agreement. Uh...we will bear the expense for that. It'll be put on a plat. So it'll be of record.

The Court:   Okay.

Attorney Connick:   David, did I ...

The Court:   [Borys], do you have any issue with that? What he just said?"

Attorney Smith:   No, that's fine.

(May 13, 2024 Hearing Tr., p. 6-7.)

**{¶47}** The Borys argue Attorney Connick predicated the new survey exclusively on the easement.  However, Attorney Connick actually prefaced the need for a new survey with the phrase, "since we're doing the easement *and everything."* Further, the trial court interjects, "is there a need for a new survey with these lines?"  Attorney Connick responds, "[Uzl] has agreed to come back and resurvey it . . . It'll be put on a plat. So it'll be of record." (*Id.*)  The trial court's reference to "these lines" (plural) could refer both to the dashed line demarcating the easement, and the new line demarcating the western border of the property subject to the settlement agreement.

**{¶48}** The Roudebushes argue counsel never referred to the 0.128 line at the May 13, 2024 hearing.  Attorney Connick referred to the property subject to the settlement agreement as "all of this disputed property in the disputed triangle."  The disputed triangle was defined in the Roudebushes' 2023 complaint as "the real estate which [the Roudebushes] claim by adverse possession" in the 2015 action. Counsel for the Borys conceded the Roudebushes' initial demand was the original eastern border of the Borys' driveway, which the Borys expanded two to three feet east. Finally, the Roudebushes' assertion that the Hammontree survey was incomplete due to obstruction by Bory is

supported by the record. Attorney Cheshire referred to "the interference" at the May 13th hearing and counsel for the Borys did not object.

**{¶49}** Equally compelling is the exchange precipitated by Attorney Smith when he asked at the May 13th hearing, "[b]ut [the second survey is] not going to include that extra two feet of driveway, right?" Attorney Cheshire responds, "[n]o, it's going to be the edge of the driveway." Attorney Smith explained at the telephonic pretrial that he was merely clarifying the eastern border for Attorney Cheshire, as he and Attorney Connick had previously explained to her during settlement negotiations. Nonetheless, Attorney Smith did not object when Attorney Cheshire warranted that the survey would extend to the edge of the driveway.

**{¶50}** Next, the Roudebushes argue the easement would not have been required if the 0.128 line was the western border of the property subject to the settlement agreement. On both the Hammontree survey and the second survey, the Borys' concrete apron appears to begin south of the 41.38 east to west line in the area marked "r/w," which means "right of way." Nonetheless, the 0.128 line stops at the 41.38 line but does not appear, if it continued, to intersect the Borys' concrete apron.

**{¶51}** Having reviewed the record, we find there was no "meeting of the minds" with respect to a material term of settlement, that is, the western boundary of the property subject to the settlement agreement. Neither counsel specifically referenced the 0.128 line at the May 13th hearing. Further, the property subject to the settlement agreement is not identified on the Hammontree survey, and the parties did not clearly delineate its boundaries at the May 13th hearing. Further, there is sufficient evidence in the record to support the conclusion that the Roudebushes believed the western boundary of the property was the current eastern border of the Borys' driveway. In the absence of clear and convincing evidence establishing a material term of the settlement agreement, we find Appellants' first assignment of error has merit and we reverse and vacate the judgment entry of the trial court resolving the cross-motions to enforce settlement in favor of the Borys.

Case No. 24 CA 0978

## BORYS' FIRST ASSIGNMENT OF ERROR

**THE PARTIES AGREED ON THE RECORD THAT COUNSEL FOR THE ROUDEBUSHES WOULD DRAFT A WRITTEN SETTLEMENT AGREEMENT AND THAT [THE BORYS] WOULD BEGIN TO MAKE PAYMENTS UPON ITS EXECUTION. HOWEVER, THE LOWER COURT'S JOURNAL ENTRY HELD THAT THE ENTRY WOULD TAKE PLACE OF A WRITTEN AGREEMENT AND THAT [THE BORYS] WERE REQUIRED TO BEGIN MAKING PAYMENTS. WAS THE LOWER COURT'S ORDER SUPPORTED BY THE SUFFICIENCY OF THE EVIDENCE?**

## BORYS' SECOND ASSIGNMENT OF ERROR

**HISTORICALLY, THE ROUDEBUSHES HAVE AGREED TO SETTLE THESE MATTERS, ONLY TO FAIL TO HONOR THEIR AGREEMENTS. THEY HAVE DONE SO FOR THE FOURTH TIME, AND [THE BORYS] HAVE EXPENDED RESOURCES ON ENFORCING THE MOST RECENT AGREEMENT. DID THE LOWER COURT ERR IN DECLINING TO AWARD [THE BORYS] THEIR ATTORNEY'S FEES FOR ENFORCING THE AGREEMENT?**

{¶52} Because the judgment entry on appeal is reversed and vacated, we find the Borys' assignments of error in their cross-appeal are moot.

## CONCLUSION

{¶53} For the foregoing reasons, the judgment entry of the trial court is reversed and vacated and this matter is remanded for trial.

Waite, J., concurs.

Robb, P.J., concurs.

Case No. 24 CA 0978

_____

For the reasons stated in the Opinion rendered herein, Appellants/Cross Appellees' assignment of error has merit and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Carroll County, Ohio, is reversed and vacated. We hereby remand this matter to the trial court for further proceedings according to law and consistent with this Court's Opinion. Costs to be taxed against Appellees/Cross-Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**